UNITED STATES of America,
Plaintiff–Appellee,

v.

James O. BAKKER,
Defendant–Appellant.

No. 89–5687.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 30, 1990.

Decided Feb. 11, 1991.

uted to the maintenance and cure claim, as the

majority attempts to do.

Don Ervin, argued, Houston, Tex., Alan M. Dershowitz, argued, Cambridge, Mass., Brian William Wice, argued, Houston, Tex. (Harold Bender, Bender & Matus, Charlotte, N.C., Nathan Dershowitz, Cambridge, Mass., on brief), for defendant-appellant.

Deborah M. Smith, argued, U.S. Dept. of Justice, Washington, D.C. (Christopher L. Varner, Sara Criscitelli, U.S. Dept. of Justice, Washington, D.C., Thomas J. Ashcraft, U.S. Atty., Jerry W. Miller, Asst. U.S. Atty., Charlotte, N.C., on brief), for plaintiff-appellee.

Before PHILLIPS and WILKINSON, Circuit Judges, and BUTZNER, Senior Circuit Judge.

WILKINSON, Circuit Judge:

This appeal stems from the trial and sentencing of a well-known televangelist, James O. Bakker. Bakker raises numerous challenges to his conviction for fraud and conspiracy. We affirm his conviction. Appellant also challenges his sentence on the grounds that the trial judge's personal religious beliefs tainted the sentencing and that the trial court erred by rejecting Bakker's attempt to classify his crimes as straddle crimes to be sentenced under the United States Sentencing Guidelines. We hold that the trial court correctly determined that Bakker's crimes did not straddle the effective date of the Guidelines and were thus to be sentenced under pre-Guidelines law. We agree with appellant, however, that remarks made by the trial court compromised the sentencing proceeding and thus deprived Bakker of due process. We therefore vacate Bakker's sentence and remand for resentencing in accordance with instructions set forth herein.

## I.

In 1974, James Bakker formed a corporation known as the PTL. PTL stands for "Praise the Lord" and "People that Love." The PTL's activities soon expanded from their initial focus on televised religious broadcasting. For example, in the late 1970s PTL began construction on "Heritage USA," described by PTL officials as a Christian retreat center for families. The concept of the center became increasingly ambitious. In 1983, Bakker announced plans to enlarge the center by adding a vacation park, "Heritage Village," that would include the 500–room Grand Hotel. Between 1984 and 1986, appellant announced further proposals to expand the Village by constructing the Towers Hotel, 50 bunkhouses, and several additional facilities.

Bakker planned to finance these projects by selling lifetime partnerships. He offered eleven different partnership programs ranging in cost from $500 to $10,000. Eight of the partnerships promised benefits that included annual lodging in one of the Heritage Village facilities. In January 1984, appellant began using the mail to solicit lifetime partners. Also, from February 1984 through May 1987, Bakker used broadcasts carried on the PTL Television Network and various commercial affiliates to solicit lifetime partners. Many of these partners drew on meager incomes to purchase Heritage Village lodging benefits. Appellant raised at least $158 million through the sale of approximately 153,000 partnerships with lodging benefits.

Bakker promised television viewers that he would limit the sale of partnerships to ensure that each partner would be able to use the facilities annually. Appellant, however, oversold the partnerships. He promised, for instance, to limit the sale of Grand Hotel partnerships to 25,000 but actually sold 66,683. In addition, Bakker used relatively few of the funds solicited from the partners to construct promised facilities. In fact, of the proposed Heritage Village facilities, only the Grand Hotel and one bunkhouse were actually completed. Instead, Bakker used partnership funds to pay operating expenses of the PTL and to support a lavish lifestyle. This extravagant living included gold-plated fixtures and a $570 shower curtain in his bathroom, transportation in private jets and limousines, an air-conditioned treehouse for his children and an air-conditioned doghouse for his pets. This combination of overselling partnerships and diverting partnership proceeds meant that the overwhelming majority of the partners never received the lodging benefits Bakker promised them.

In response to these activities, a grand jury on December 5, 1988 indicted Bakker on eight counts of mail fraud in violation of 18 U.S.C. § 1341, fifteen counts of wire

fraud in violation of 18 U.S.C. § 1343, and one count of conspiracy in violation of 18 U.S.C. § 371. Bakker's trial began on August 28, 1989 and lasted five weeks. The jury found him guilty on all 24 counts. The court sentenced him to 45 years imprisonment and fined him $500,000. Bakker now appeals his conviction and sentence.

## II.

Appellant raises a host of challenges to his conviction. First, Bakker contends that the trial court failed to ensure that an impartial jury, untainted by publicity, heard his case. Second, he argues that the court, by refusing to grant a continuance during the trial, denied him the effective assistance of counsel. Third, Bakker challenges two evidentiary rulings made at trial. Finally, he contends that the court incorrectly instructed the jury with respect to his defense of good faith. We shall address these contentions in turn.

### A.

Bakker contends principally that the media coverage of his business dealings and legal proceedings operated to violate his Sixth Amendment right to an impartial jury. Bakker characterizes the publicity surrounding his case as "venomous," "recent, pervasive and widespread." For its part, the government contends the media coverage of Bakker's activities was largely "dispassionate and factual."

#### 1.

Bakker twice moved for a change of venue to alleviate the alleged prejudicial effects of the publicity surrounding his case. We discern no abuse of discretion, however, in the various denials of his motions.

Motions for a change of venue call for a two-step analysis. *See, e.g., United States v. Jones,* 542 F.2d 186, 193 (4th Cir.1976). As a first step, a trial court must address whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted. In that case, a motion for a change of venue should be granted before jury selection begins. This court has cautioned, however, that "[o]nly in ex-

treme circumstances may prejudice be presumed from the existence of pretrial publicity itself." *Wells v. Murray,* 831 F.2d 468, 472 (4th Cir.1987). Instead, a trial court customarily should take the second step of conducting a *voir dire* of prospective jurors to determine if actual prejudice exists. *Wansley v. Slayton,* 487 F.2d 90, 92–93 (4th Cir.1973). Only where *voir dire* reveals that an impartial jury cannot be impanelled would a change of venue be justified.

We are unpersuaded by Bakker's argument that prejudice must simply be presumed in his case. Sheer volume of publicity alone does not deny a defendant a fair trial. *See, e.g. Dobbert v. Florida,* 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). The magistrate judge reviewed the evidence and denied Bakker's first change of venue motion because, among other reasons, he concluded "that much of the publicity is simply *not* inflammatory or prejudicial." The trial court, in ruling on Bakker's second change of venue motion, examined news coverage relating to Bakker in 1989. This coverage concerned primarily the recent trial of his former assistants (James and David Taggart) or the plea agreement entered into by his co-defendant (Richard Dortch), matters tangentially related to Bakker's case. The court concluded that the vast majority of the evidence reflected unemotional, factual reports of legal proceedings with no prejudicial impact on Bakker. *See, e.g., Murphy v. Florida,* 421 U.S. 794, 801 n. 4, 95 S.Ct. 2031, 2036 n. 4, 44 L.Ed.2d 589 (1975) (important to distinguish between factual and inflammatory publicity).

Upon reviewing the evidence, the magistrate judge also concluded that the bulk of media attention with respect to Bakker occurred in 1987, the time when he resigned from the PTL and a "holy war" erupted over which televangelist would control the organization. The recency of alleged prejudicial publicity is important because "[o]bviously where considerable time has elapsed since publication, the probability or likelihood of impact is appre-

ciably lessened." *Wansley*, 487 F.2d at 93. *See, e.g., Patton v. Yount*, 467 U.S. 1025, 1032–33, 104 S.Ct. 2885, 2889–90, 81 L.Ed.2d 847 (1984) (noting that the passage of time diminishes the effects of potentially prejudicial publicity). After 1987, the level of publicity about Bakker had subsided. In fact, at the hearing, he could point to only a handful of instances in 1989 where media coverage could arguably be characterized as inflammatory. And of these few items, most occurred in January of 1989, fully seven months before trial was to begin. Under these conditions, we believe the court properly concluded that the passage of time diminished the impact of publicity upon a jury pool in the court's district.

■ In deciding whether to presume prejudice based on pre-trial publicity, a court can consider the source of that publicity. The source of much of the publicity in this case was Bakker himself who, both before and after his indictment, engaged in a calculated media campaign to deny any wrongdoing and regain control of the PTL following his resignation in March 1987. For example, Bakker appeared on a May 1987 *Nightline* interview during which he emphasized his desire to return to his ministry. This national program attracted an audience of approximately thirteen million viewers, its largest audience to that time. After Bakker's indictment, he appeared on the nationally syndicated *Sally Jesse Raphael Show*, and appeared on his own television show asking for money for his restructured television ministry. While Bakker had every right to protest his innocence, he must recognize that his pre-trial acts and statements invited media attention. In our view, a defendant should not be allowed to manipulate the criminal justice system by generating publicity and then using that same publicity to support his claim that the media attention surrounding his case created a presumption of prejudice.

■ Before a court may presume prejudice, it must determine whether a jury substantially less subject to the publicity can be impanelled in another location. *See, e.g.*, 2 C. Wright, *Federal Practice and Procedure: Criminal 2d*, § 342 at 251 (2d ed. 1982). Here, the magistrate judge noted the nationwide publicity surrounding the Bakker case. Indeed, the magistrate judge observed that items of pre-trial publicity identified by Bakker as inflammatory received comparatively broader dissemination outside the court's district than within it. Such a finding weighs heavily against a change of venue based on a presumption of prejudice in Bakker's case.

2.

■ The trial court, rather than presuming prejudice, employed *voir dire* to assess whether pre-trial publicity actually biased the potential jurors within its district. Bakker contends, however, that the trial court failed to conduct an adequate *voir dire* in a number of ways. He argues, for example, that the *voir dire* was not thorough enough because the court completed it in one day. We reject this contention because "[s]uch quantitative comparisons are unhelpful—the only issue is whether . . . *voir dire* was sufficient to impanel an impartial jury." *United States v. LaRouche*, 896 F.2d 815, 830 (4th Cir.1990). In this case, the trial court conducted a sufficient *voir dire* directed at disclosing the impact that both past and future media attention would have upon potential jurors. In this respect, the court questioned potential jurors about exposure to pre-trial publicity including specific media reports, about exposure to the opinions of others, about the juror's personal opinions about the case, and about whether media attention during the trial would influence a juror's decisions.

■ Bakker contends, however, that the court erred by refusing to submit his written questionnaire to potential jurors. We disagree. A trial court has broad discretion to control the scope of questions during *voir dire. Rosales–Lopez v. United States*, 451 U.S. 182, 188–89, 101 S.Ct. 1629, 1634–35, 68 L.Ed.2d 22 (1981) (plurality opinion); *United States v. Robinson*, 804 F.2d 280, 283 (4th Cir.1986). As the government notes, the questionnaire was concerned less with ensuring an impartial

jury and more with ensuring a jury inclined to acquit. The trial court was not obliged to ask questions such as "Do you believe in miracles?" and "Would you be offended by someone blaming the devil?" Nor did the court abuse its discretion by declining to ask potential jurors about their familiarity with the term "overbooking" and whether they had ever been unable to get an airline ticket because of it. Moreover, quite a few of the court's questions during *voir dire* did come from the written questionnaire submitted by Bakker. Thus, Bakker had an opportunity to acquire much of the information he sought.

■ Bakker also objects that the court itself questioned potential jurors rather than allowing counsel to question them, and that the questioning was collective rather than individual. Both of these contentions are without merit. It is well settled that a trial judge may conduct *voir dire* without allowing counsel to pose questions directly to the potential jurors. *See* Fed.R.Crim.P. 24(a). When the court completed questioning a group of jurors, it followed the precepts of Rule 24(a) by asking if the parties had any additional questions and then posing those questions. The court did not refuse, at this point in the process, to propound a question proposed by Bakker. In addition, it is well established that a trial judge may question prospective jurors collectively rather than individually. *See United States v. Vest*, 842 F.2d 1319, 1331–32 (1st Cir.1988); *United States v. Reeves*, 730 F.2d 1189, 1194–95 (8th Cir.1984). This is especially true where, as here, the trial court provides for individual questioning of a juror whose initial responses prove less than satisfactory and offers potential jurors the opportunity to speak with the court privately. In this case, several jurors were indeed questioned individually, when it appeared necessary.

A review of the jury selection process reveals that the trial court was quite fair to the defendant. The court granted all of the defense's challenges for cause. When the government and the defense both used a peremptory challenge on the same juror, the court counted it as a challenge for cause. Moreover, Bakker used only nine of his ten peremptory challenges. At the end of the *voir dire*, Bakker's counsel even expressed his satisfaction with the jury designated to hear the case.

■ In an era of rapid and widespread communications, trial courts must be vigilant to ensure that jurors are not biased and trials are not compromised by media attention surrounding a case. At the same time, "it is not required ... that jurors be totally ignorant of the facts and issues involved.... It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722–23, 81 S.Ct. 1639, 1642–43, 6 L.Ed.2d 751 (1961). The proper way to impanel such jurors is through a careful *voir dire* like that conducted by the trial court here. When combined with other precautions taken by the trial court, the *voir dire* guaranteed to Bakker a fundamental Sixth Amendment right: that a defendant, regardless of his standing in the community or the repugnance of his crimes, will have his case heard fairly and impartially by his peers.

### 3.

■ As a final point related to publicity, Bakker argues that the trial court's refusal to grant his motion to sequester the jury unjustifiably exposed the jury to influence from the media and public opinion. The decision on whether to sequester the jury is committed to the sound discretion of the trial judge because that court is in the best position to assess the environment surrounding a trial and the ability of jurors to avoid outside influences. *See, e.g., United States v. Walton*, 602 F.2d 1176, 1179 n. 1 (4th Cir.1979). Further, sequestration imposes substantial burdens on jurors beyond those already associated with performing the civic duty of jury service. *See, e.g., United States v. Porcaro*, 648 F.2d 753, 755 (1st Cir.1981) (sequestration is "one of the most burdensome tools of the many available to assure a fair trial"). Here, sequestration would have separated jurors from family and friends for five weeks.

The trial court certainly did not abuse its discretion in instituting adequate precautions, in lieu of sequestration, to shield the jurors from outside influences.[1]

### B.

As an additional ground of appeal, Bakker argues that the trial court's refusal to grant him a requested continuance denied him the effective assistance of counsel. On August 31, before trial resumed that day, Bakker's counsel stated to the court that Bakker was unable to assist in his own defense due to psychological problems. The court held a competency hearing and ordered Bakker to be sent to a federal facility for psychiatric evaluation and treatment.

On September 6, Bakker appeared before the district court for a second competency hearing. At this hearing, the chief of psychiatric services at the federal facility testified that Bakker was competent to stand trial and aid in his defense. Both Bakker and his counsel concurred in that assessment. The court accordingly found Bakker to be competent and ordered the trial to resume. Bakker's counsel then moved for a five-day continuance in the trial to "reestablish the attorney-client relationship." The court denied this request and the trial resumed later that afternoon, September 6.

■ To prove that the denial of the continuance constitutes reversible error, Bakker must demonstrate that the court abused its "broad" discretion and that he was prejudiced thereby. *United States v. LaRouche*, 896 F.2d at 823–25. Abuse of discretion has been defined in these circumstances as "unreasoning and arbitrary insistence on expeditiousness in the face of a justifiable request for delay." *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610,

1616–17, 75 L.Ed.2d 610 (1983). Here, the trial court balanced the interests of all parties and reached a well-considered decision to proceed. For example, the court properly factored into its decision the interests of some twenty government witnesses who had been sent home when Bakker was committed for a psychiatric exam and who had returned for trial on September 6. The witnesses would have been sent home a second time had Bakker's continuance been granted. *See, e.g., Morris*, 461 U.S. at 11, 103 S.Ct. at 1616 (permissible to consider the scheduling of witnesses when deciding a motion for continuance).

■ More importantly, the court determined that Bakker's commitment had not seriously interfered with the attorney-client relationship. During his stay at the mental facility, Bakker had been coherent and available to consult with his attorneys. The court also noted that the defense had nine months prior to trial to prepare and that Bakker himself had devoted two or three months prior to trial to extensive preparation. In addition, the court observed that defense counsel had time on the morning that trial resumed to consult with Bakker. Finally, the court noted that the government, not Bakker, would be presenting its case when trial resumed. Consequently, Bakker could observe the government's witnesses and provide his attorneys with any useful information for cross-examination as the trial progressed.

Furthermore, Bakker has simply failed to show how the denial of the continuance prejudiced him. *See, e.g., United States v. Lorick*, 753 F.2d 1295, 1297 (4th Cir.1985). We reject at the outset Bakker's argument that *Geders v. United States*, 425 U.S. 80, 96 S.Ct. 1330, 47 L.Ed.2d 592 (1976), re-

---

1. For example, the court, throughout jury selection, inquired of potential jurors whether they could avoid all media coverage and talking about the case with friends or family. In addition, the court repeatedly cautioned the jurors throughout the trial to avoid media coverage and to refrain from discussing the case. In this regard, before trial began in the morning and after it resumed following lunch, the court inquired whether the jurors had been exposed to any outside influences concerning the case. If a juror was exposed to such an influence, he or she was interviewed outside the presence of other jurors and defense counsel had the opportunity to question and challenge the juror. The court also ordered all newspapers and magazines removed from the jury room after a magazine with an article about Bakker was discovered. Finally, the court ordered United States Marshals to escort the jurors to and from their cars to protect them from outside influences.

quires that prejudice be presumed in his case. In *Geders,* the trial court ordered a defendant not to consult with his attorney during a regular overnight recess, which was called while the defendant was on the stand as a witness and shortly before cross-examination was to begin. The Court held that this interference with the attorney-client relationship resulted in per se prejudice to the defendant's right to effective assistance of counsel. *Id.* at 91, 96 S.Ct. at 1336. *Geders* turned on the trial court's interference with and denial of the right to counsel. *See, e.g., Perry v. Leeke,* 488 U.S. 272, 279–80, 109 S.Ct. 594, 599–600, 102 L.Ed.2d 624 (1989). In Bakker's case, by contrast, any decision by defense counsel not to consult with his client was his own and not one compelled by the district court. We do not believe that the denial of the continuance prejudiced Bakker's right to the effective assistance of counsel.

## C.

Bakker next contends that the trial court abused its discretion in two evidentiary rulings. In one, the trial court admitted into evidence video tapes which the government claimed summarized Bakker's efforts during PTL broadcasts to solicit lifetime partners. In the other ruling, the court prevented Bakker from introducing two charts which purported to summarize the construction and availability of facilities at Heritage Village. In our view, the trial court did not abuse its discretion in making either of these rulings.

### 1.

As part of the government's case, an F.B.I. agent testified that he reviewed over two hundred hours of PTL broadcasts that had aired from February 1984 to April 1987 and edited them into eleven composite tapes. These tapes, which allegedly showed Bakker's attempts during the broadcasts to solicit funds for Heritage Village, were admitted into evidence. Bakker objects both to the procedure by which the trial court admitted the tapes into evidence and to the substance of the tapes themselves.

 Bakker contends that before the composite tapes could come into evidence, the original broadcast tapes on which the composites were based first had to be introduced into evidence under Fed.R.Evid. 1006.[2] Bakker's argument, however, attempts to graft onto Rule 1006 a requirement that is at odds with the Rule's purpose and plain meaning.

The purpose of Rule 1006 is to provide a practicable means of summarizing voluminous information. Fed.R.Evid. 1006 advisory committee's note. This purpose was well served in this case since viewing all of the original broadcast tapes would have taken over 200 hours of the court's and jury's time. The language of the Rule also does not require that the original voluminous material be introduced into evidence; rather it simply requires that the material be made available to the other party. It is undisputed that Bakker's counsel had access to the original broadcast tapes at least six months prior to trial. Requiring the government to formally introduce the underlying tapes into evidence would have served no useful purpose.

The cases Bakker relies on in arguing that the originals must be introduced are inapposite. These cases deal with situations where a party is attempting to use a chart or other device to summarize information that has already been introduced into evidence. *See, e.g., United States v. Keltner,* 675 F.2d 602, 605–06 (4th Cir. 1982). In these circumstances, the device used to summarize is merely an aid to the fact-finder's understanding, not evidence itself. *See, e.g.,* 5 Weinstein & Berger, *Weinstein's Evidence,* ¶ 1006[07], pp. 1006–

---

2. Fed.R.Evid. 1006 provides:

The contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation. The originals, or duplicates, *shall* be made available for examination or copying, or both, by other parties at reasonable time and place. The court *may* order that they be produced in court.
(Emphasis added.)

15–17. By contrast under Rule 1006, the summary of voluminous information is itself the evidence to be examined by the fact-finder. *See id.* at ¶ 1006[02], pp. 1006-6-7. Thus, no need exists to introduce the underlying voluminous material into evidence.

 Bakker also argues that the substance of the composite tapes was unrepresentative of his broadcasts. Bakker's objection is misplaced because it goes to the weight to be accorded to the composite tapes, not to their admissibility. *See, e.g., United States v. Porter,* 821 F.2d 968, 974–75 (4th Cir.1987). Once the court properly determined that the tapes were admissible, Bakker had ample opportunity to demonstrate to the jury the proper weight that it should attach to the composites. For instance, Bakker played for the jury the tapes of three of his broadcasts in their entirety in an attempt to show that the composites were unrepresentative. In sum, it can hardly be claimed that Bakker was prejudiced by the admission of the composite tapes. *See, e.g., United States v. Means,* 695 F.2d 811, 817 (5th Cir.1983).[3]

### 2.

 Bakker also contends that the trial court abused its discretion by denying his motions to have his chart summaries admitted into evidence. These charts purported to summarize the lodging facilities available to lifetime partners. The court sustained the government's initial objection to the charts being admitted into evidence, though the court did allow Bakker to testify about the charts' contents and to use them to refresh his recollection. After Bakker had finished testifying, his counsel renewed his motion to admit the chart summaries, but the court again denied the motion.

Our prior discussion of the distinction between the types of devices used to summarize information is also relevant here. Bakker's charts did not purport to summarize voluminous records; rather they allegedly summarized information already introduced into evidence. The governing standard then is that "summary charts may be admitted if they are based upon and fairly represent competent evidence already before the jury." *United States v. Porter,* 821 F.2d at 975. The problem for Bakker is that the government objected at trial that his charts did not fairly represent the evidence already before the jury, and the court sustained these objections. Bakker then stated that his "memory" served as additional supporting evidence for the charts. The trial court was right to conclude that a party's memory is no substitute for "evidence already before the jury."

The government demonstrated at least two ways in which the charts unfairly represented the evidence. First, the charts showed that PTL condominiums were available to house lifetime partners. Yet, Bakker conceded that partners were not informed that the condominiums were available and that they were actually not used to house partners. Second, the charts showed that prospective partners were notified that they might have to accept campsites in lieu of hotel rooms. In fact, Bakker admitted that he did not so notify prospective partners. Based on this information, we believe the court properly exercised its discretion in excluding chart "summaries" that could easily have misled the jury.

**3.** At oral argument, for the first time in the appellate process, Bakker also claimed that the trial court erred by allowing chart summaries introduced by the government to be published to the jury over Bakker's objection. Bakker should have raised this argument initially in his appellate brief, not at oral argument. In any event, we find the assignment of error to be without merit. Essentially, Bakker argues that both sides must give their consent before a chart summary can be published to the jury.

While obtaining mutual consent is preferable, we do not believe Bakker was prejudiced by the publication of the government's summaries. *See, e.g., United States v. Gardner,* 611 F.2d 770, 776 n. 3 (9th Cir.1980). The court prevented any prejudice from occurring by cautioning the jurors that "summaries are used only as a matter of convenience; so if . . . you find that they are not in truth summaries of facts or figures shown by the evidence . . . you are to disregard them entirely."

## D.

▇ Bakker next contends that the combination of the trial court's instruction on a permissive presumption as to specific intent and its instruction on his good-faith defense somehow shifted the burden of persuasion from the government to him.

We find this claim to be meritless. On the permissive presumption, the judge instructed the jury:

> You may consider it reasonable to draw the inference and find that a person intends the natural and probable consequences of an act knowingly done or knowingly omitted but you are not required to do so. As I said, it is entirely up to you to decide what facts to find from the evidence.

In our view, this instruction was perfectly proper in this case, especially given that the court twice cautioned the jury in this very instruction that it need not draw even this most logical of inferences. *See, e.g., United States v. Love*, 767 F.2d 1052, 1059–60 (4th Cir.1985).

The court next instructed the jury:

> And good faith is a complete defense to the charges in the Indictment since good faith on the part of the defendant is inconsistent with intent to defraud or willfulness which is an essential part of the charges. The burden of proof is not on the defendant to prove his good faith, of course, since he has no burden to prove anything. The government must establish beyond a reasonable doubt that the defendant acted with a specific intent to defraud. One who expresses an opinion honestly held by him is not chargeable with fraudulent intent even though his opinion is erroneous or his belief mistaken. And, similarly, evidence which establishes only that a person made a mistake in judgment or an error in management or was careless does not establish a fraudulent intent.

The court then added:

> [A]n honest belief on the part of the defendant that a particular business venture was sound and would ultimately succeed, would not in and of itself constitute good faith as used in these instruc-

tions if in carrying out that venture the defendant knowingly made false or fraudulent representations to others with specific intent to deceive them.

Bakker argues that this second paragraph of instructions rendered the good-faith defense less than a complete one and shifted the burden of persuasion on specific intent to him. Certainly, good-faith is a complete defense but only for those defendants who act within its confines. The second paragraph simply clarifies those well-established confines: a defendant does not qualify for the good-faith defense if he honestly believed a venture would succeed yet at the same time furthered the venture by acting with a specific intent to deceive others. *See United States v. Painter*, 314 F.2d 939, 942–43 (4th Cir.1963).

These instructions in no way imply that a defendant must disprove that he acted with specific intent in order to qualify for the defense. Instead, the burden remains on the government to show that the defendant acted with the specific intent necessary to vitiate the good-faith defense as well as the specific intent necessary for conviction on the underlying fraud charges. Further, the trial court cautioned the jury throughout the instructions that the government bore the burden of persuasion on specific intent. Therefore, these instructions were proper and did not prejudice Bakker.

## III.

We conclude, therefore, that Bakker's trial was free of reversible error. The same, however, cannot be said of his sentencing. The sentence imposed on Bakker encompassed a 45–year prison term and a fine of $500,000. In regard to this sentence, Bakker raises two primary claims. He first contends that all his crimes, especially the conspiracy, should be deemed "straddle crimes" and thus covered by the Guidelines. We disagree. However, we do agree with Bakker's second contention that the trial court abused its discretion by taking impermissible considerations *into* account when sentencing him.

## A.

We turn first to Bakker's contention that he should be sentenced under the United States Sentencing Guidelines. The Guidelines "apply only to offenses committed after" November 1, 1987. Sentencing Act of 1987, Pub.L. No. 100–182, § 2(a). The question is how the language "offenses committed after" affects the application of the Guidelines to an ongoing crime, such as a conspiracy, in which acts comprising the crime occur both before and after the effective date of the Guidelines. *See, e.g., United States v. Story*, 891 F.2d 988, 991 (2d Cir.1989). In the context of an ongoing crime, courts have interpreted "offenses committed after" to mean offenses continuing after the effective date of the Guidelines. Under this approach, a conspiracy begun before November 1, 1987 and continuing after that date, thus straddling the effective date, would be sentenced under the Guidelines. *See, United States v. Sheffer*, 896 F.2d 842 (4th Cir. 1990).

As evidence of his involvement in a straddle conspiracy, Bakker points to the indictment. The indictment did not charge Bakker with taking any overt acts in furtherance of the conspiracy after November 1, 1987, but the indictment did charge that the conspiracy occurred "[f]rom on or about January 1, 1982, and continuing until the present, the exact dates being unknown to the Grand Jury...." Because the indictment was returned on December 5, 1988, Bakker contends that his conspiracy continued after the effective date of the Guidelines.

In our view, the ending date of an indictment does not govern whether an offense should be classified as a straddle crime. *See, e.g., Story*, 891 F.2d at 992. At the indictment stage, defining the exact end of a conspiracy can be difficult particularly because a defendant frequently has more precise knowledge than the government about when the conspiracy actually terminated. Consequently, ending dates on indictments are often tentative and subject to change as more information is revealed during the course of legal proceedings. In

addition, using the ending date of an indictment as the determinant of Guidelines applicability could allow the government to manipulate whether a defendant was sentenced under the Guidelines simply by choice of ending date. For these reasons, the ending date stated in an indictment cannot control the straddle-crime question.

Instead, to determine if a crime straddles the effective date of the Guidelines, we examine whether the conspiracy actually " 'was carried on and continued beyond the effective date of the Act.' " *United States v. Sheffer*, 896 F.2d at 844–45 (citations omitted). To determine if a conspiracy was "carried on" beyond the effective date we examine whether the government introduced evidence at trial of a member of the conspiracy acting to further it after November 1, 1987. *See, e.g., United States v. Meitinger*, 901 F.2d 27, 28–29 (4th Cir. 1990); *United States v. Tharp*, 892 F.2d 691, 692 (8th Cir.1989). Bakker contends that the government did introduce evidence that he furthered the conspiracy after November 1, 1987. After reviewing the evidence Bakker identified in support of his claim, we find his claim to be unfounded. While one witness may have misidentified a fundraising brochure he received in 1988 as being from the PTL, this piece of evidence can hardly be said, in the course of a five-week trial, to justify Bakker's claim that he acted in furtherance of the conspiracy after November 1, 1987. Bakker can point to little else to support his claim. As a result, Bakker's conspiracy cannot be deemed a straddle crime.

The same can be said with even greater force about his mail and wire fraud offenses. These are not ongoing crimes of the type that can straddle the effective date; rather, they are crimes that occur on specific, identifiable occasions and none of those occasions of fraud occurred after November 1, 1987. Therefore, Bakker had no legal right to be sentenced under the Guidelines, and, in turn, the trial court did not err in refusing his request to be sentenced thereunder. *See, e.g., United States v. Polk*, 905 F.2d 54, 55 (4th Cir. 1990).

■ Nonetheless, Bakker contends that even if the Guidelines do not technically apply to his crimes, the court abused its discretion by failing to look to the Guidelines for guidance when sentencing him. Although we believe that a district court may consult the Guidelines to inform a pre-Guidelines sentence, it is not an abuse of discretion to do otherwise. If Bakker had no right to be sentenced under the Guidelines, as we have held, he similarly had no right to demand that the district court exercise its discretion by consulting a statutory scheme that did not apply to his crime. Bakker's sentence was proper, therefore, as long as the court did not abuse its discretion within pre-Guidelines law.

### B.

■ Therein lies the basis for Bakker's final challenge to his sentence. During sentencing, the judge stated of Bakker: "He had no thought whatever about his victims and *those of us who do have a religion are ridiculed as being saps from money-grubbing preachers or priests.*" Bakker contends that these comments reveal that the trial judge abused his discretion and violated due process by factoring his own sense of religiosity and victimization into the sentence he imposed on Bakker.

In contrast, the government argues that the phrase "those of us" reflects the judge speaking not for himself but for society as a whole. The government also contends that the trial court was simply considering the impact of Bakker's crimes on society and was well within its discretion in doing so. We recognize that a sentencing court can consider the impact a defendant's crimes have had on a community and can vindicate that community's interests in justice. *See, e.g., United States v. Torres*, 901 F.2d 205, 246–47 (2d Cir.1990). To a con-

siderable extent a sentencing judge is the embodiment of public condemnation and social outrage. *See, e.g., United States v. Madison*, 689 F.2d 1300, 1314–15 (7th Cir. 1982). As the community's spokesperson, a judge can lecture a defendant as a lesson to that defendant and as a deterrent to others.[4] If that were all that occurred here, the court would have been properly exercising its discretion, and we would be loathe to disturb what surely is an integral part of the sentencing process.

Sentencing discretion, however, must be exercised within the boundaries of due process. *See, e.g., Gardner v. Florida*, 430 U.S. 349, 358, 97 S.Ct. 1197, 1204, 51 L.Ed.2d 393 (1977) (plurality opinion); *United States v. Safirstein*, 827 F.2d 1380, 1384–87 (9th Cir.1987). In this case, the trial judge exceeded those boundaries. Courts have held that sentences imposed on the basis of impermissible considerations, such as a defendant's race or national origin, violate due process. *See, e.g., United States v. Borrero–Isaza*, 887 F.2d 1349, 1352–57 (9th Cir.1989); *United States v. Gomez*, 797 F.2d 417, 419 (7th Cir.1986) (sentencing more harshly based on nationality or alienage "obviously would be unconstitutional.") While these cases focused on a defendant's characteristics, we believe that similar principles apply when a judge impermissibly takes his own religious characteristics into account in sentencing.

Our Constitution, of course, does not require a person to surrender his or her religious beliefs upon the assumption of judicial office. Courts, however, cannot sanction sentencing procedures that create the perception of the bench as a pulpit from which judges announce their personal sense of religiosity and simultaneously punish defendants for offending it. Whether or not the trial judge has a religion is irrelevant for purposes of sentencing. Regrettably, we are left with the

---

**4.** For example, many of the comments the district court made reflect an appropriate exercise of the sentencing function. The court faulted Bakker for believing that he "deserves all of his gain received from the little people who sent in their savings," noted that where "the top management of any organization ... is deceitful

and untruthful, it gradually filters down to the lower echelons," and concluded that "there was massive fraud here and I feel like it's going to have to be punished." We find no fault in any of these statements, and believe the court acted well within its discretion in making them.

apprehension that the imposition of a lengthy prison term here may have reflected the fact that the court's own sense of religious propriety had somehow been betrayed. In this way, we believe that the trial court abused its discretion in sentencing Bakker. Consequently, the sentence is vacated and the case is remanded for resentencing. This resentencing will be carried out by a different district judge to ensure that the ends of due process are achieved. *See, e.g., United States v. Diamond,* 561 F.2d 557, 559 (4th Cir.1977).

## IV.

We remand this case with genuine reluctance because Bakker's assignments of error at the trial phase only underscore a proceeding which was fairly conducted in the face of trying circumstances. As our prior discussion has made plain, we have carefully scrutinized the record and we are confident that the district court meticulously observed this defendant's rights at trial. We thus refuse to accept Bakker's contention that we should somehow give any alleged error at sentencing retroactive effect by saying that it infected the trial.

Yet, the fact remains that this case involves the explicit intrusion of personal religious principles as the basis of a sentencing decision; at least, that is not an unfair reading of the trial court's comments in this case. We recognize that a trial judge on occasion will misspeak during sentencing and that every ill-advised word will not be the basis for reversible error. In this case, however, our review of the sentencing transcript reveals comments that are, in the end, too intemperate to be ignored. Because an impermissible consideration was injected into the sentencing process, we must remand the case.

AFFIRMED IN PART, VACATED IN PART AND REMANDED.