4 F.3d 986
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
James C. FERGUSON, a/k/a Tee, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James C. FERGUSON, a/k/a Tee, Defendant-Appellant.
 Nos. 92-5571, 92-5587.
 United States Court of Appeals,
Fourth Circuit.
 Argued: April 1, 1993.
Decided: September 1, 1993.
 
 Appeals from the United States District Court for the District of South Carolina, at Columbia. Falcon B. Hawkins, Chief District Judge; Charles E. Simons, Jr., Senior District Judge. (CR-91-138-3, CR-91-136)
 W. Gaston Fairey, Fairey & Parise, P.A., Columbia, South Carolina, for Appellant.
 John Michael Barton, Assistant United States Attorney, Columbia, South Carolina, for Appellee.
 John S. Simmons, United States Attorney, Columbia, South Carolina, for Appellee.
 D.S.C.
 AFFIRMED.
 Before PHILLIPS, HAMILTON, and LUTTIG, Circuit Judges.
 PER CURIAM:
 
 OPINION
 
 1
 James C. "Tee" Ferguson appeals his conviction and sentence for conspiracy to violate and attempts to violate, the Hobbs Act, 18 U.S.C. Sec. 1951, and the sentence imposed upon his conviction by pleas of conspiracy to possess and possession of cocaine in violation of 21 U.S.C. Secs. 844(a), 846. We affirm the convictions and sentences imposed.
 
 
 2
 * Ferguson's Hobbs Act indictment grew out of Operation Lost Trust, an investigation by the Federal Bureau of Investigation (FBI) to substantiate allegations of corruption in the South Carolina legislature. To facilitate that investigation, the FBI obtained the cooperation of Ron Cobb, a former state legislator turned registered lobbyist, by agreeing not to prosecute him for any prior state or federal crimes-including, specifically, an attempt to finance and purchase a kilogram of cocaine-if he assisted the Bureau.
 
 
 3
 Pursuant to this agreement Cobb began presenting himself to members of the legislature as a lobbyist for the Alpha Group, a fictitious client ostensibly seeking legalization of parimutuel betting in SouthCarolina and willing to pay for it. When legislators expressed interest in payment for their votes on the bill, the payments and discussions were recorded by the FBI.
 
 
 4
 Ferguson, a South Carolina legislator, approached Cobb about some money for a car he wanted. Cobb suggested that the Alpha Group might provide some if Ferguson helped secure passage of the bill legalizing parimutuel betting. Over the next few months Cobb made two payments to Ferguson in exchange for his support on the bill.
 
 
 5
 Ferguson was indicted and tried before a jury on the Hobbs Act violations and convicted on all three. He then entered pleas of guilty or nolo contendere to each of the six counts in the cocaine possession indictment. The district judge handling the Hobbs Act violations imposed concurrent sentences of 33 months on each count, and later the same day a different district judge sentenced Ferguson to 7 months on each of the cocaine possession counts, the sentences to be served concurrently with each other and with the 33 month sentences already imposed for the Hobbs Act violations.
 
 
 6
 We consolidated the timely appeals from the Hobbs Act convictions and the sentencing decisions of the two district judges that followed. Four claims are presented. First, Ferguson claims the government violated his constitutional rights by peremptorily striking prospective jurors based on race. Second, he contends that the district court improperly instructed the jury with respect to the Hobbs Act violations. Third, he argues that the district court unconstitutionally restricted his cross-examination of the government's principal witness. Finally, he asserts that the district court violated his constitutional rights at sentencing by improperly considering a letter he wrote to United States Senator Joseph Biden. We take these in order.
 
 II
 
 7
 Initially, Ferguson, who is black, argues that the United States violated his constitutional rights by striking members of the jury venire "solely on account of their race or on the assumption that black jurors as a group will be unable impartially to consider the State's case against a black defendant." Batson v. Kentucky, 476 U.S. 79, 89 (1986).[1]
 
 
 8
 Under now-familiar Batson doctrine, a defendant makes out a prima facie case of discrimination by showing that the government peremptorily struck some members of a cognizable racial group from the venire under circumstances raising "an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." Id. at 96; United States v. Malindez, 962 F.2d 332, 333 (4th Cir.), cert. denied, 113 S. Ct. 215 (1992).[2] The government must then advance a neutral explanation for its strikes, id. at 97, which the defendant may impeach as pretextual or inadequate. Id. at 97-98; United States v. Joe, 928 F.2d 99, 102 (4th Cir.), cert. denied, 112 S. Ct. 71 (1991).
 
 
 9
 Where the district court has required the government to explain its strikes, however, we typically forego any inquiry into whether the prima facie case was made and consider only whether the district court correctly evaluated those explanations, always mindful that the burden of demonstrating discrimination remains with the defendant. See, e.g., United States v. Woods, 812 F.2d 1483, 1487 (4th Cir. 1987). In considering this question, we accord the district court's conclusions great deference, Batson, 476 U.S. at 98 n.21, reviewing them solely for clear error. See Lane, 866 F.2d at 106.
 
 
 10
 Few hard and fast rules govern this difficult evaluative enterprise. Some guidelines have, however, emerged in experience. It is accepted that case-specific factually based explanations must be provided; simple denials of discriminatory purpose or affirmations of good faith are inadequate, as are any explanations based on the assumption of race-based sympathy. Batson, 476 U.S. at 97-98. Surrounding circumstances reflect on the persuasive force of the explanations advanced; explanations that appear plausible when half the minority veniremen are struck seem less so when all have been. Recognition of the latter, however, doesn't reduce the question to one of mathematics. Statistical comparisons are "a poor way to resolve a Batson challenge"; the right secured is the right to a fair selection process, not a right to proportional representation. United States v. Grandison, 885 F.2d 143, 148 (4th Cir. 1989), cert. denied, 495 U.S. 934 (1990). Thus both the seating of one or more minority jurors and the exclusion of a disproportionate number of minority venirepersons are facts "entitled to substantial consideration" on a Batson claim, but neither is dispositive. Joe, 928 F.2d at 103.
 
 
 11
 With this framework in mind we turn to the specifics of Ferguson's claim. His Batson attack focuses on the government's peremptory exclusions of two black jurors, Sharon Greenwood and Bertha Davis, to both of which he objected in the district court.[3] The government provided facially neutral explanations for the strikes, explanations Ferguson claimed were mere pretexts for invidious discrimination but which the district court accepted. Ferguson now argues that the district court erred in doing so. We evaluate its decisions with respect to the two strikes separately.
 
 
 12
 * The government predicated its peremptory removal of the first black juror in question, Sharon Greenwood, on the alleged animosity and hostility toward the government and lack of candor she betrayed on voir dire. The former justification was founded on the government's observation of Greenwood's nonverbal conduct, while the latter was based on her asserted lack of knowledge concerning Operation Lost Trust, a widely publicized inquiry into corruption among South Carolina public officials (one of whom was Ferguson), despite the fact that she claimed to read three newspapers and watch television news. Both justifications are obviously case specific, and neither is facially inadequate under the standards articulated in Batson and reiterated above. Those threshold criteria having been met, we turn to more contextual evaluation.
 
 
 13
 As Ferguson notes, the nonverbal expressions of animosity and hostility on which the government allegedly relied in part in dismissing juror Greenwood present difficulties for appellate secondguessing about discrimination, but peremptory challenges long have been based on just such unarticulable minutiae of demeanor, and Batson did nothing to change this fact. See Batson, 476 U.S. at 89. While we agree with Ferguson that a dry reading of the record discloses no overt hostility or animosity on Greenwood's part, we are unwilling to conclude from this dry reading that no such ill will existed. Moreover, the government's more concrete basis for decision, the conclusion that Greenwood wasn't being candid on voir dire concerning her awareness of Operation Lost Trust (or, alternatively and less perniciously, her reading habits), seems entirely reasonable. Accordingly, we find no clear error here.
 
 B
 
 14
 The government also advanced two reasons for the peremptory exclusion of Bertha Davis, another black member of the venire. First, the Assistant United States Attorney trying the case noted that her behavior-she allegedly stared at Ferguson throughout voir dire-reminded him of an earlier case in which a prospective juror who had acted similarly later proved to be the defendant's most ardent supporter in that jury's deliberations. Second, the government questioned Davis's capacity to understand and apply the law to the facts of the case.
 
 
 15
 Once again we have a facially neutral allegation of reliance on essentially unreviewable nonverbal conduct (Davis's alleged staring at the defendant). Once again too we have a more objective facially neutral basis for decision, the government's conclusion that Davis wasn't capable of handling the complexities inherent in this lengthy circumstantial case. After a careful review of the voir dire transcript containing Davis's testimony, we conclude that the district court's acceptance of the government's explanation wasn't clearly erroneous.
 
 
 16
 In assessing the credibility of these explanations in light of the surrounding circumstances, we are not unmindful of the fact that the government exercised its peremptories against a disproportionate number of black venirepersons: 3 of 9 government peremptories (33%) were used to exclude from the jury 3 of the 6 blacks (50%) in the 37 person venire. Nevertheless, the fact remains that 3 of the 12 seated jurors (25%) were black[4] (a disproportionately high percentage given the 16% black venire ), and the government didn't exercise any of its other six peremptories to remove them. Awarding these facts the substantial consideration to which they are entitled, we nevertheless conclude that they do not impeach the district court's conclusion.
 
 III
 
 17
 Moving from the beginning of his trial to the end, Ferguson argues in his second claim of error that the district court improperly instructed the jury with respect to requirements for conviction under the Hobbs Act. The first count of Ferguson's indictment charged a conspiracy to violate the Act, and the second and third counts charged attempts to violate it.
 
 
 18
 The relevant statute provides in pertinent part that
 
 
 19
 (a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do ... shall be fined not more than $10,000 or imprisoned not more than twenty years, or both.
 
 
 20
 (b) As used in this section-
 
 
 21
 ...
 
 
 22
 (2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.
 
 
 23
 Federal courts have wrestled with the difficulties posed by prosecuting political corruption cases under the Hobbs Act ever since the government discovered its utility for that purpose. The principal difficulty lies in distinguishing legitimate solicitation of political contributions from unlawful extortion of payments for official action or inaction. Before the Supreme Court's reversal of this circuit's decision in United States v. McCormick, 896 F.2d 61 (4th Cir. 1990), rev'd, 111 S. Ct. 1807 (1991), federal courts had reached different conclusions on the question whether the Hobbs Act required an explicit quid pro quo-i.e. payment in return for "an explicit promise or undertaking by the official to perform or not to perform an official act," McCormick, 111 S. Ct. at 1816-to distinguish legitimate political contributions from violations. McCormick answered that question in the affirmative, 111 S. Ct. at 1816-17, but left unresolved another tough question, whether an official needed to make an affirmative act of inducement to be convicted under the Hobbs Act. 111 S. Ct. at 1813 n.5. That question was quickly answered, however, by the Supreme Court's decision a year later in Evans v. United States, 112 S. Ct. 1881, 1889 (1992), which held that inducement wasn't required and the government "need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts."
 
 
 24
 In this case arising after McCormick but before Evans the district court charged the jury as follows:
 
 
 25
 [E]xtortion under color of official right is the taking or attempted taking by a public official of property not due to him or his office, whether or not the public official employed force, threats or fear.
 
 
 26
 Extortion under color of official right, however, does not require proof of specific acts by the public official demonstrating force, threats or the use of fear so long as the victim consented because of the office or position held by the official who obtained the money.
 
 
 27
 In other words, the wrongful use of otherwise valid official power may convert dutiful action into extortion. If a public official accepts or demands property in return for a promised performance or nonperformance of an official act, the official is guilty of extortion....
 
 
 28
 If the public official knows that the motivation of the victim focuses on the public official's office and moneys obtained by the public official which were not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right.
 
 
 29
 Inducement does not necessarily require a demand by the defendant. Inducement by a public official in the sense that he over[t]ly solicited the payment is not an essential element of the offense. It is enough that the payer transfer something of significant value to the public official that is not due the public official with the expectation that the public official will extend to him some benefit or refrain from some harmful action, and the public official accepts the thing of significant value knowing that it is being transferred to him because of his agreement to perform some act that was associated with or connected to his official position as a member of the South Carolina House of Representatives.
 
 
 30
 Inducement can be in the overt form of a demand or in the more subtle form such as custom or expectation, such as might have been communicated by the nature of the defendant's prior conduct of his office.
 
 
 31
 Therefore, to find James C. "Tee" Ferguson guilty of attempt to commit extortion under color of official right you must be convinced beyond a reasonable doubt that at the time the payments were made to the defendant he was aware that the payments were intended to influence his official conduct.
 
 
 32
 The mere voluntary payment of money standing alone would not constitute extortion. You have heard the latin phrase quid pro quo throughout this trial. Simply put quid pro quo means something for something.
 
 
 33
 For the government to establish that the defendant committed the extortion under color of official right it must prove that the payments were made in return for an explicit promise or undertaking by the defendant to perform or not perform an official act as a member of the South Carolina House of Representatives.
 
 
 34
 Ferguson contends that these instructions implied that he could be convicted without the need to find an explicit promise or undertaking to perform or not perform official acts, which is inconsistent with McCormick. In support of this alleged implication he refers to the court's use of phrases like "expectation," "custom or expectation," and "nature of the Defendant's prior conduct of his office."
 
 
 35
 The portion of the charge to which Ferguson refers, however, has nothing to do with the explicit quid pro quo requirement; it concerned an element of proof-inducement-the government no longer has to provide. This can only be to Ferguson's advantage, for we are confident the jury could distinguish the cited portion of the instruction-that the jury could convict without finding that Ferguson had overtly demanded money-and the instruction that he must nevertheless have made an explicit promise of official action or inaction in exchange for the funds and taken the funds knowing that they were paid for the promise. Nothing in these instructions suggests that anything other than an explicit promise by the defendant to perform or not perform an official act would suffice to convict him.
 
 
 36
 Before concluding our discussion of the jury instructions, we raise a point not brought to our attention by the parties but worthy of recognition sua sponte. Two of the instructions given by the district court[5] have since been criticized by us as conflicting with McCormick. See United States v. Taylor, 993 F.2d 382, 384-86 (4th Cir. 1993) (sustaining earlier reversal for inadequate jury instructions). We reversed in Taylor, however, because the case was tried before McCormick and the district court there instructed the jury that no quid pro quo was required: "So long as the defendant knows that the money sought would be paid because of the public office involved, there need be no promise with respect to official action in return for the payment." Quoted in Taylor, 993 F.2d at 384. The two instructions involved here, which neither suggest nor refute a quid pro quo requirement, are less problematic where the district court included that requirement in its charge on both the criminal act and the required mens rea.[6] The district court should not have given the two instructions in question, referring as they do to official "conduct" and the public official's "office" rather than to official "acts," but the remainder of the charge leaves their meaning unambiguous, and we would not reverse on this basis even if Ferguson properly had preserved the issue.
 
 IV
 
 37
 In his third claim of error Ferguson contends that the district court violated his Sixth Amendment right to confront the witnesses against him by improperly denying him a meaningful opportunity to crossexamine the government's star witness, Ron Cobb. Cobb testified pursuant to an immunity agreement, and Ferguson wanted the opportunity to pursue in depth the possible sanctions Cobb had avoided by doing so, because, as Ferguson's counsel put it,"[t]he idea of going to jail for 20 years will encourage a man to do a lot of things he wouldn't do if he was facing paying a $100 fine for a traffic ticket." In response to a motion in limine filed by the government, the district court limited Ferguson's cross-examination of Cobb on this issue to establishment of the fact that he avoided possible fines and prison terms for the various uncharged offenses.
 
 
 38
 No doubt a criminal defendant has a right under the Sixth Amendment's Confrontation Clause adequately to cross-examine for bias the witnesses against him. See Davis v. Alaska, 415 U.S. 308, 316-17 (1974). That right encompasses the ability "to expose to the jury the facts from which jurors, as the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness." Id. at 318. It is not, however, unlimited: the Confrontation Clause guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." Delaware v. Fensterer, 474 U.S. 15, 20 (1985). "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986).
 
 
 39
 The restrictions imposed by the district court on Ferguson's crossexamination of Cobb for bias fall within this wide latitude to impose reasonable limits. Although we have in the past found a Confrontation Clause violation where a district court forbade any inquiry into "[the witness's] understanding of his stake in testimony adverse to [the defendant]," Hoover v. Maryland, 714 F.2d 301, 305, 306 (4th Cir. 1983), the trivial limitations on that inquiry imposed by the district court here serve to distinguish this case from that one. The district court permitted Ferguson's counsel to cross-examine Cobb extensively about the unprosecuted criminal conduct covered by his immunity agreement, including an attempt to arrange financing for the purchase of a kilogram of cocaine, 50 to 60 distributions of cocaine, and five payments to members of the South Carolina legislature in connection with various legislation. Indeed, Ferguson's only objection lies in the district court's refusal to let his counsel inquire of Cobb-or, more correctly, suggest to him-the maximum sentence that might be imposed on him if he were convicted of those crimes.
 
 
 40
 No such specific inquiry was required under the circumstances presented here. Although Ferguson's counsel wasn't permitted to ask Cobb about the maximum sentences he might face, he was permitted to ask Cobb, with respect to each uncharged offense, whether he would be in "serious trouble" were he to be prosecuted for it and found guilty. At the conclusion of these inquiries, Ferguson's counsel asked, "And all those things, Mr. Cobb, could have put you in the penitentiary; isn't that correct?" To which Cobb replied, "That's correct, but you got to understand I am the one that told the government about all these things." In addition to this testimony on the immunity agreement, Ferguson's counsel was permitted to elicit from Cobb a host of additional information tending to show bias, including testimony about his extensive debts, the $80,000k in compensation he had already received from the government for his work as an undercover informant, the potential for further monetary reward, and other crimes he may have committed since executing the last of his immunity agreements. Under these circumstances, we have no doubt that Cobb's potential bias was fully exposed, and we conclude that the insubstantial restriction on Ferguson's cross-examination of him imposed by the district court falls within its wide latitude to impose reasonable limits on such cross-examination to ward off prejudice and repetitive, marginally relevant interrogation. Van Arsdall, 475 U.S. at 679; see also United States v. Dorta, 783 F.2d 1179, 1182 (4th Cir.) (finding no Confrontation Clause violation on similar facts), cert. denied, 477 U.S. 905 (1986).
 
 V
 
 41
 Ferguson's final claim of error concerns not his Hobbs Act convictions or the resulting sentence but the sentence imposed on him for possession of cocaine. At sentencing on these convictions, the district court refused to downwardly adjust his Guidelines offense level for acceptance of responsibility. See U.S.S.G.Sec. 3E1.1. This refusal was founded in part on consideration of a letter Ferguson had written to United States Senator Joseph Biden.[7] Ferguson argues that the district court's consideration of this letter at sentencing violated his due process rights. More specifically, he argues that the district court unlawfully "imposed its own set of personal beliefs" in ascertaining his sentence.
 
 
 42
 Ferguson correctly notes the existence of due process constraints on the wide sentencing discretion accorded district courts. United States v. Bakker, 925 F.2d 728, 740 (4th Cir. 1991). In Bakker, we observed that sentencing based on certain considerations, like the defendant's race or national origin, exceeds those limits. Id. We also added to that list of impermissible considerations the sentencing court's personal sense of religious propriety, concluding that "[c]ourts ... cannot sanction sentencing procedures that create the perception of the bench as a pulpit from which judges announce their personal sense of religiosity and simultaneously punish defendants for offending it. Whether or not the trial judge has a religion is irrelevant for purposes of sentencing." Id.
 
 
 43
 Bakker differs critically from the case at hand, however, and the district court's reliance on Ferguson's letter to Senator Biden at his cocaine possession sentencing didn't violate Ferguson's due process rights. Unlike the district judge in Bakker, the district judge here didn't create the appearance of sentencing Ferguson on the basis of the judge's own improperly considered personal beliefs. Nor did the district court create the appearance that it refused to award Ferguson the acceptance of responsibility reduction because he exercised his First Amendment right to send a letter to Senator Biden. The district court refused to credit Ferguson with acceptance of responsibility because the letter to Senator Biden, in conjunction with other evidence, rightly convinced it that Ferguson hadn't accepted responsibility for his criminal acts but instead was still trying to label his prosecution persecution and blame it on someone else. Sentencing based on lack of contrition and remorse has a long history, and cannot be thought to violate the requirements of due process where, as here, it is adequately supported by objective evidence.
 
 VI
 
 44
 Because our review of Ferguson's four claims discloses no reversible error, we affirm on this consolidated appeal all his convictions and all the sentences imposed by the district court.
 
 SO ORDERED
 
 
 [1]
 Batson involved a challenge to a state prosecution brought under the Fourteenth Amendment's Equal Protection Clause, but it also applies to federal prosecutions via the Fifth Amendment. United States v. Lane, 866 F.2d 103, 104 n.1 (4th Cir. 1989)
 
 
 [2]
 Powers v. Ohio, U.S., 111 S.Ct. 1264 (1991), has now settled that a defendant need not be a member of the racial group of the allegedly improperly excluded juror(s) to make the challenge-a point not relevant here and noted only out of caution
 
 
 [3]
 He also challenged the government's decision to strike a third black juror, Joe Nell Graham, but on appeal he presents no objection to the government's explanation for it
 
 
 [4]
 This was due at least in part to the fact that Ferguson used all 13 of his own peremptory strikes against white jurors
 
 
 [5]
 These are the two instructions, quoted above in context:
 (1) "If the public official knows that the motivation of the victim focuses on the public official's office and moneys obtained by the public official which were not lawfully due and owing to him or the office he represented, that is sufficient to satisfy the requirements of the law of extortion under color of official right." (2) "Therefore, to find James C. 'Tee' Ferguson guilty of attempt to commit extortion under color of official right you must be convinced beyond a reasonable doubt that at the time the payments were made to the defendant he was aware that the payments were intended to influence his official conduct."
 
 
 [6]
 As we noted above, the district court told the jury that "[i]f a public official accepts or demands property in return for a promised performance or nonperformance of an official act, the official is guilty of extortion." Later it told the jury that "the public official [must accept] the thing of significant value knowing that it is being transferred to him because of his agreement to perform some act that was associated with or connected to his official position." Finally the court told the jury that "quid pro quo means something for something," then instructed it that the government had to prove "that the payments were made in return for an explicit promise or undertaking by the defendant to perform or not perform an official act."
 
 
 [7]
 In the letter, Ferguson asked to appear before the Senate Judiciary Committee to publicly accuse the Department of Justice and FBI of singling him out for investigation and prosecution on public corruption charges because of his position as an influential black office holder. The letter also cited examples of events said to support this accusation