**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                        No. 95-5727

CHRISTOPHER J. BAILEY,
Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of West Virginia, at Charleston.
Charles H. Haden II, Chief District Judge.
(CR-95-2)

Argued: September 24, 1996

Decided: May 2, 1997

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Affirmed by published opinion. Judge Widener wrote the opinion, in
which Judge Russell and Judge Hall joined.

_____

**COUNSEL**

**ARGUED:** Hilary Gerard Kelley, Sr., Roberta Frances Green, SHU-
MAN, ANNAND & POE, Charleston, West Virginia, for Appellant.
Rebecca A. Betts, United States Attorney, Charleston, West Virginia,
for Appellee. **ON BRIEF:** Mychal S. Schulz, JACKSON & KELLY,
Charleston, West Virginia, for Appellant. Charles T. Miller, Assistant
United States Attorney, Stephanie D. Thacker, Assistant United States
Attorney, Philip J. Combs, Assistant United States Attorney, Charles-
ton, West Virginia, for Appellee.

**OPINION**

WIDENER, Circuit Judge:

Christopher J. Bailey appeals his convictions and subsequent sentencing in the district court for the Southern District of West Virginia under Title 18 U.S.C. § 1201(a)(1), kidnapping, and Title 18 U.S.C. § 2261(a)(2), interstate domestic violence. The jury found Bailey guilty of both counts after the government presented evidence at trial that Bailey had assaulted his wife in their home and subsequently driven her in and out of the State for a period of five days before taking her to a hospital in Kentucky. The court sentenced Bailey to life imprisonment for the kidnapping conviction and imposed a concurrent 20 year sentence, a five year term of supervised release, and ordered him to pay $40,000 in restitution for the interstate domestic violence conviction. Bailey claims numerous errors by the trial court, and we affirm.

I. FACTS

Defendant Christopher Bailey married Sonya Bailey on December 19, 1991. Mrs. Bailey's 14 year-old daughter from a previous marriage, Jessica, lived with the couple and was adopted by Bailey. Christopher Bailey is an alcoholic.

On November 25, 1994, a Friday evening, the defendant and his wife went out to a local bar. At some point thereafter they began to argue, and at about 10:30 p.m. Mrs. Bailey went to another bar, the Circle C. About a half hour later the defendant joined her there.

Bailey was drunk and disruptive at the Circle C. The bouncer asked Bailey not to disturb his wife and other patrons. Eventually, sometime between 2:00 a.m. and 2:30 a.m. the bouncer required Bailey to leave the Circle C. Mrs. Bailey stayed until after 2:45 a.m.

Christopher Bailey testified that he remembered going to the Circle C, that he argued with Sonya Bailey, and that he was asked to leave by the bouncer. He testified that the last thing he remembered about that night was going to Big Bertha's across the street, and that he did

2

not remember leaving that establishment. He attributes this memory loss to an alcoholic blackout which he claims lasted until late the next afternoon.

On Saturday November 26, 1994 Bailey was due at work by 7:00 a.m. At 8:10 a.m., as a result of his failure to report, Lucy Curry, a co-worker of the defendant, called the Bailey home to inquire why he was late for work. A woman whom Miss Curry believed to be Mrs. Bailey answered the phone and spoke briefly with Miss Curry before she summoned Bailey. Bailey said that he would not be coming into work that day.

When Jessica Bailey and her house guest came downstairs at about 10:00 a.m., Jessica looked into her parents' bedroom. She saw Bailey on the bed, but could not see over him to see whether her mother was on the bed.

At some point during that morning Mrs. Bailey suffered a head injury which included a laceration on her forehead. Investigating officer Jeff Gundy testified that Mrs. Bailey lay on the bed for an extended period. The blood had saturated one pillow, soaked through the sheet and mattress cover, and pooled on the mattress of the waterbed.

The government presented evidence that the defendant had pulled the covers up over the blood-stained areas, which obscured the blood. Bailey told his cellmate at the county jail that he placed his wife in the trunk, in case he was stopped by police. The government pointed to blood in the spare-wheel well of the trunk, the strong odor of urine, and the scratch and dent marks on the inside of the trunk door, as evidence indicating that Mrs. Bailey was locked in the trunk of the car for some period of time over the next six days. Jessica Bailey's house guest stated that by noon the Camry and Bailey were no longer at the residence. At 12:26 p.m. Bailey cashed a $75 check at a bank in South Charleston.

Bailey testified that he came out of his blackout some time that afternoon while driving on Route 119, whereupon, he claims, he discovered his wife on the back seat of the car under a blanket. She was unconscious with blood on her head and clothes. Bailey's brief states

3

that he was "shocked by the appearance of his wife" and was "scared that he may have inflicted her injuries." He claims that at that time he decided not to take her to a hospital, but rather to "avoid publicity and to treat her himself."

Bailey testified that they spent the night on the side of the road and that he tried to clean Mrs. Bailey with a washcloth. Based on receipts and documents collected upon Bailey's arrest it is undisputed that on Sunday, November 27, 1994, he stopped at a K-Mart in Pikeville, Kentucky. There he purchased shampoo, soap, a razor, hydrogen peroxide, one pair of sweat pants, and a package of T-shirts. That night he used his Visa card to register under his own name for two people in a Knight's Inn in Ashland, Kentucky. The next day, November 28, Bailey drove to Hurricane, West Virginia, 20 miles from their home, and withdrew all of the couple's joint savings account. Bailey then drove to Georgetown, Kentucky where he registered for two people at the Flag Inn. On Tuesday, November 29, he drove to Walton, Kentucky and registered for two people for the next two nights at a Red Carpet Fountain Inn. During this time Bailey purchased various items to treat Mrs. Bailey. Finally, on December 1, Bailey drove to Corbin, Kentucky where at 1 p.m. he registered at a Days Inn. Bailey testified that at this time he realized Sonya was beyond his efforts to help her and that he had to get her medical assistance. At 6:15 p.m., five days after Bailey claims he came out of the blackout, Bailey brought his wife to the emergency room at Baptist Regional Medical Center in Corbin.

Upon arrival at the hospital Mrs. Bailey's condition was desperate, as she was suffering from both external and internal injuries. She had a three-inch laceration on her forehead and two black eyes. She also had three wounds on her forehead that were still bleeding when the police photographer arrived at the hospital. She exhibited a subconjunctive hemorrhage in her right eye, and corneal abrasions had resulted from having her contact lenses in place for almost a week. There were bruises around her throat, abrasions on her knees, and pressure sores on her feet. She also had ligature bruises on her wrists, and her ankles had similarly been bound and resulted in what would be permanent scars.

Internally the damage was more extensive. The doctors diagnosed Mrs. Bailey as suffering from very severe anoxic brain injury, a con-

4

dition which results when nerve cells are destroyed due to a lack of oxygen. This condition often results from a loss of the flow of blood to the brain. Finally, as a result of not receiving adequate food or water for at least three or four days, Mrs. Bailey suffered from profound dehydration, which in turn caused her to experience renal failure.

Many of Mrs. Bailey's injuries are permanent. At trial the government presented the testimony of Dr. Biundo, Mrs. Bailey's treating physician, as to her condition at the time of trial and her prognosis. He testified that she was unable to follow commands and had minimal comprehension of what was said to her. She lacked the ability to talk, and was capable only of making vowel sounds. Mrs. Bailey was incapable of feeding herself and relied on a gastrointestinal tube to receive most of her nutrition. She was incontinent, suffered severe contractions in her upper and lower extremities, and the only voluntary movement she could perform was the slight extension of her left knee. Additionally, her sense of hearing, smell, and sight were impaired. The doctor testified that most likely she will never walk again, but that with years of rehabilitation she may learn to feed herself and to talk.

Corbin police officers arrested Christopher Bailey at Baptist Regional Medical Center on December 1, 1994. A criminal complaint was filed in the Southern District of West Virginia on December 6, 1994 charging Bailey with kidnapping, in violation of 18 U.S.C. § 1201(a)(1). The federal grand jury on January 4, 1995 returned a two-count indictment charging Bailey with the kidnapping count, and one count of interstate domestic violence, 18 U.S.C.§ 2261(a)(2). After the defendant's arraignment on January 19 the court entered a standard discovery order on January 24, 1995.

Three days later, Bailey filed an ex parte motion requesting a conference regarding his need for private investigative services and experts. In his motion Bailey requested approval and funds for the services of a forensic expert or criminalist to determine the age of the blood and human waste in the Camry, and to inspect the back seat of the Camry for anything that could have been left by Mrs. Bailey. Under the heading of medical experts the defense requested a psychiatrist and psychologist to examine Bailey and a medical practitioner

5

specializing in trauma patients who could review and explain Mrs. Bailey's injuries. The conference was held and the court advised defense counsel on the procedural steps available to obtain the necessary resources, noting in particular the requirement of filing separate ex parte motions for each service requested. **1** As a result of that first ex parte motion Bailey advises that he received additional counsel.

Bailey next filed three ex parte motions seeking funds for investigators and experts. The court in an in camera proceeding the next day denied the motions. The court described the requests as seeking

> an open-ended approval for hiring expert services to prove a defense or defenses that might develop factually and legally during the course of investigation.

Accordingly, the court required the defendants to isolate what points needed investigation, and then request with specificity funds for those limited purposes.

On February 17 the court held a pretrial motion hearing. The defendant had filed two motions, one for a continuance of the March 7, 1995 trial date and another reserving the right to file future motions. The court continued the trial for more than 60 days, rescheduling it for May 16, 1995.

Meanwhile, pursuant to the discovery order, the government provided the defendant discovery, thereby putting the defendant on notice that the government was conducting hair, fiber, and blood analysis. In addition to answering standard discovery requests, this comprehensive discovery disclosure included some 500 pages of reports and photographs, revealed areas in which the government intended to employ expert testimony, and identified over 100 exhibits. The government supplemented this disclosure on five separate occasions in February and March.

_____

**1** Title 18 § 3006A establishes the procedures to be followed by the counsel of an indigent defendant in seeking the resources necessary to provide a constitutionally sound defense. It allows defense counsel to make ex parte applications for investigative, expert, and other services if they are necessary for an adequate defense. 18 U.S.C. § 3006A(e)(1).

6

Weeks later, between April 5 and April 18, 1995 Bailey filed separate ex parte motions for experts. His April 13 ex parte motion requested approval to retain a criminalist. The motion stated that Bailey required a criminalist to respond to the testimony of the government's forensic pathologist, forensic serologist, and hair and fibers analyst. In a footnote the defense noted that Dr. William Cox, a forensic pathologist engaged by the defense for preliminary discussion about the case, had indicated that a criminalist, not a forensic pathologist, could best address the blood, hair, and fiber analysis.

At an April 18, 1995 ex parte hearing the court granted the defendant's request for approval to retain (1) investigative services, (2) a forensic psychiatrist; and (3) a forensic pathologist. The court denied without prejudice the defense's motions for approval to obtain a criminalist and an addictionologist.[2] The court noted that it did not perceive any justification for a criminalist in addition to the forensic pathologist.[3] The court stated that perhaps the forensic pathologist the defense had talked to might not be "qualified by experience to testify in some of these areas, but there are plenty of forensic pathologists who . . . can give such testimony."[4]

_____

[2] Bailey obtained a physician to testify as to an alcoholic addiction, apparently without previous court approval.

[3] In attempting to articulate a difference between a forensic pathologist and a criminalist the defense stated that pathologists:

> look at bodies and . . . injuries and causes of death . . . but if you really want to get into the actual analysis of the blood and of the hair fibers and the other types of fibers, the clothing fibers, you need to get somebody that does that. . . . I used the word "criminalist" because it seems to me more encompassing-- it tends to encompass hair, blood, clothing, semen, all of that.

[4] A comparison of the definitions of these professions does little to illuminate the specific distinctions between them. According to Black's Law Dictionary, Abridged 6th Edition, a criminalist is

> [o]ne versed in criminal law, one addicted to criminality, and, also, a psychiatrist dealing with criminality.

p. 261. The field of forensic pathology is described as:

> [t]hat branch of medicine dealing with diseases and disorders of the body in relation to legal principles and cases.

p. 449.

7

The court at that hearing also removed the seal from portions of the ex parte proceedings. In response to the defense objections that such action would reveal attorney-client communications, the court agreed to redact information that the attorney had received from Bailey, noting that it couldn't "imagine that the government will have divined much about the defense of the case from what you have told me." The court also offered to, on motion, assign the ex parte motions to another judge. Such a motion was not made by the defendant, however.

Bailey filed his final ex parte motion on April 27, 1995. It specifically requested approval to retain "an expert in the analysis of hair, fiber and blood." The court set the hearing for May 3, 1995, but at the defendant's request rescheduled the hearing for Friday May 5, following the second pretrial motions hearing.

At the May 5 pretrial motions hearing the court entertained five defense motions. These included an April 11 motion to suppress hair and blood samples; an April 13 motion for a change of venue due to the local pretrial publicity; and three motions to dismiss the indictment, which were filed at 4:30 p.m. on May 4, 1995- the day before the motion hearing. On May 9, 1995 the court denied all five motions.

In the absence of the attorney for Bailey, having continued the hearing until May 5th, the court, at Bailey's instance, granted the motion for funds for a hair, fiber, and blood expert. Its written order was entered on Tuesday May 9, one week before the May 16 trial was to begin.

On Friday afternoon, May 12, defense counsel filed a motion for a second continuance claiming that his hair, fiber, and blood expert had insufficient time to review the evidence. The court denied the motion stating that any delay in securing the assistance of a hair, fiber, and blood expert was the fault of the defendant. The court rejected the defendant's claim that the previous ex parte motions of January 27 and April 13 had requested a hair, fiber, and blood expert. Finally, in denying the continuance the court noted that the defendant had already received a two-month continuance and had failed to attend the May 5th hearing.

8

On May 15, 1995, pursuant to the court's request, the defendant submitted proposed voir dire questions for the jurors. Subsequently, during voir dire, most, if not all, the jurors acknowledged that they had heard of the events of the case through the press. The court then asked if any of the prospective jurors would be predisposed in favor of one side or the other, to which all the jurors responded in the negative. In response the defendant renewed his motion for a change of venue and moved for the first time for individual voir dire about what each potential juror "specifically remembers about the case" from the media coverage. The court denied both motions.

The case went to trial and on May 23, 1995 the jury found Bailey guilty of both counts. On September 1, 1995 the district court sentenced the defendant. The sentencing guidelines recommended a range of 121-151 months, but the court departed upwards. The court cited U.S.S.G. § 5K2.2 as permitting the more severe sentence, and noted five aspects of the crime as supporting the departure. Among the court's justifications was the "massive impairment to [Mrs. Bailey's] total body functioning." On September 13, 1995 the district court entered its judgment, imposing a life sentence with a concurrent 20 year term, a five year term of supervised release, and $40,000 in restitution, from which the defendant appealed.

II. THE CLAIMED ERRORS

Bailey raises a panoply of purported errors by the district court. He begins by challenging the constitutionality of the interstate domestic violence statute and then faults each following step of the proceedings to the court's upward departure from the sentencing guidelines. We address the alleged errors in general in the order that they are said to have occurred, and not by degree of merit, or lack thereof, we find them to possess.

A. Validity of the Domestic Violence Statute

Bailey claims that the second charge of his indictment, alleging violations of the recently enacted interstate domestic violence statute 18 U.S.C. § 2261(a), should have been dismissed because he claims that Congress exceeded its power under the Commerce Clause. The

9

interstate domestic violence statute is in Title II of the Violence Against Women Act. The statute provides:

> (a) <u>Offenses.</u>-
>
> (1) Crossing a State Line.-A person who travels across a State Line or enters or leaves Indian Country with the intent to injure, harass, or intimidate that person's spouse or intimate partner, and who, in the cause of or as a result of such travel, intentionally commits a crime of violence and thereby causes bodily injury to such spouse or intimate partner shall be punished as provided in subsection (b).
>
> (2) Causing the crossing of a State Line.-A person who causes a spouse or intimate partner to cross a State line or to enter or leave Indian Country by force, coercion, duress, or fraud and, in the course or as a result of that conduct, intentionally commits a crime of violence and thereby causes bodily injury to the person's spouse or intimate partner, shall be punished as provided in subsection (b).

18 U.S.C. § 2261(a).[5]

Bailey was one of the first charged under the statute, and so far as has come to our attention, the statute has not been previously challenged in a reported case or in any of the courts of appeals. Two district courts, however, have reached opposite conclusions as to the constitutionality of a part of Title III of the Violence Against Women Act, which creates a private right of action against an individual who commits a crime of violence motivated by gender. [6] See 42 U.S.C. § 13981(c).

_____

[5] We do not deal here with an intimate partner, Mrs. Bailey was Bailey's wife.

[6] See <u>Doe v. Doe</u>, 929 F. Supp. 608 (D. Conn. 1996) (finding 42 U.S.C. § 13981, a part of Title III of the Violence Against Women Act to be a

10

Bailey's challenge to § 2261(a) relies on the Supreme Court's recent decision in United States v. Lopez, 63 U.S.L.W. 4343 (1995), which restricted Congress' commerce power. In Lopez the Court reviewed the constitutionality of former 18 U.S.C.§ 922(q), the Gun-Free School Zone Act of 1990, which made it a federal offense for "any individual knowingly to possess a firearm at a place that the individual knows, or has reasonable cause to believe, is a school zone". Lopez, 63 U.S.L.W. at 4343 (quoting 18 U.S.C. § 922(a)(1)(a)(1988 ed., Supp. V)). The Court found that Congress had acted beyond its commerce power in enacting the statute because the statute had "nothing to do with `commerce' or any sort of economic enterprise," 63 U.S.L.W. at 4346, nor any"jurisdictional element which would insure . . . that the firearm possession in question affects interstate commerce." Lopez, 63 U.S.L.W. at 4347.

Bailey asserts that after Lopez, where Congress is acting pursuant to its commerce power it can regulate the (1) channels and (2) instrumentalities of interstate commerce, but beyond that it may only regulate (3) activities that are substantially related to commerce. Bailey argues that §2261(a) does not regulate either of the first two categories (channels or instruments of interstate commerce) and thus the Lopez analysis requires that the conduct to be regulated must have more than an interstate nexus, it must directly affect commerce.

The government argues that by contrast, the domestic violence statute contains such a provision (by requiring the crossing of a state line) and thus is not subject to what is called the substantially and directly analysis of Lopez.

We find it unnecessary to go in detail into the arguments applicable in Lopez, for we think previous decisions of the Supreme Court apply and that the statute in question is valid.

_____

proper exercise of Congressional power under the Commerce Clause); but see Brzonkala v. Virginia Polytechnic and State University, 935 F. Supp. 779 (W.D. Va. 1996) (holding the same section invalid as an unconstitutional exercise of Congress' power).

We express no opinion as to the constitutionality of 42 U.S.C. § 13981, a part of Title III of the Act. We are concerned only with the validity of 18 U.S.C. § 2261(a), a part of Title II of the Act.

In Caminetti v. United States, 242 U.S. 470 (1917), the Court held valid the White Slave Traffic Act of 1910. In that case, the defendant had been convicted of transporting and causing to be transported and aiding in the transportation of a certain woman from Sacramento, California to Reno, Nevada for the purpose of debauchery, that is to say, that the woman should be the mistress of the defendant. The Court upheld the conviction and stated:

> The transportation of passengers in interstate commerce, it has long been settled, is within the regulatory power of Congress, under the commerce clause of the Constitution, and the authority of Congress to keep the channels of interstate commerce free from immoral and injurious uses has been frequently sustained, and is no longer open to question.

242 U.S. at 491.

In Cleveland v. United States, 392 U.S. 14 (1946), the defendant was convicted of a violation of the Mann Act, 18 U.S.C. § 398, which forbade the transportation in interstate commerce of any woman or girl for the purpose of prostitution or debauchery or for any other immoral purpose. The defendants had transported women across state lines for the purpose of cohabiting with them as plural wives in violation of law. The Court sustained the convictions and stated:

> The fact that the regulation of marriage is a state matter does not, of course, make the Mann Act an unconstitutional interference by Congress with the police powers of the States. The power of Congress over the instrumentalities of interstate commerce is plenary; it may be used to defeat what are deemed to be immoral practices; and the fact that the means used may have "the quality of police regulations" is not consequential.

329 U.S. at 19.

The present case is so similar to Cleveland and Caminetti that we think those cases are controlling. The statute requires the crossing of a state line, thus placing the transaction squarely in interstate com-

12

merce. And it requires the commission of a crime of violence causing bodily injury, which certainly is not different from the immoral purpose forbade in Cleveland and the debauchery forbade in Caminetti. We are of opinion the statute is valid.

B. The Indictment is not Multiplicitous

Similarly, we reject Bailey's argument that the indictment is multiplicitous. The argument goes that the domestic violence statute is merely a specific version of the kidnapping statute. Bailey argues that the indictment charges him twice for a single course of conduct, i.e. kidnapping, and kidnapping his wife. He claims that although the interstate domestic violence statute requires proof of the additional fact that the victim was his spouse, that in his case this is the only real distinction between the two charged offenses. Therefore, Bailey concludes, § 2261(a) is merely a more specific version of the kidnapping statute, and that employing both would punish him twice for the same offense.[7] Bailey argues that under the Rule of Lenity of Busic v. United States, 446 U.S. 398, 406 (1980), where there is multiplicity the more specific statute, here the interstate domestic violence statute, must take precedence and the more general charge of kidnapping must be dismissed.

It is well established that two statutes, although punishing the same transaction, are not multiplicitous where each requires proof of an additional fact which the other does not require. Blockburger v. United States, 284 U.S. 299, 304 (1932). The Court recently reaffirmed this standard for multiplicity.

_____

[7] The federal kidnapping statute, 28 U.S.C. § 1201(a) provides:

> (a) Whoever unlawfully seizes, confines, inveigles, decoys, kidnaps, abducts, or carries away and holds for ransom or reward or otherwise any person, except in the case of a minor by the parent thereof, when-
>
> (1) the person is willfully transported in interstate or foreign commerce; . . .
>
> shall be punished by imprisonment for any term of years or for life, and if the death of any person results, shall be punished by death or life imprisonment.

13

> If "the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one is whether each provision requires proof of a fact which the other does not."

Rutledge v. United States, 64 U.S.L.W. 4238, 4239 (1996) (quoting Blockburger, 284 U.S. at 304).

Clearly, the domestic violence statute requires proof of several facts which the kidnapping statute does not, the most obvious of which is that the victim be "a spouse or intimate partner." Equally apparent is that the kidnapping statute requires proof of the additional element that the defendant held the victim "for ransom or reward or otherwise." Although there are other differences between the elements of the domestic violence statute and the crime of kidnapping, these two stated differences satisfy the Blockburger requirement that each statute require the proof of an element which the other does not. Accordingly, we find that the interstate domestic violence statute proscribes conduct distinct from that criminalized by the kidnapping statute. Therefore, Bailey's two-count indictment under the interstate domestic violence statute and kidnapping statute is not multiplicitous and must stand.

C. Argument Respecting Procedure

Bailey's next argument is that the district court "inappropriately and unconstitutionally" protracted the process by which he sought to obtain money for investigators and experts. The argument goes that such protraction "required Bailey to expend far more attorney time and resources than are envisioned under 18 U.S.C.§ 3006A and allowed by the United States Constitution."

The essence of the argument is that the district court considered Bailey's various requests one at a time instead of all together, not that the necessary services were not provided. The series of motions is referred to in the statement of facts in the early part of this opinion.

The rule in this circuit is that

14

> Under 18 U.S.C. § 3006A(e)(1) the district court may grant requests for expert services other than counsel upon a finding that "the services are necessary and that the person is financially unable to obtain them."

Jones v. Murray, 947 F.2d 1106, 1113 n. 4 (4th Cir. 1991), cert. denied, 505 U.S. 1245 (1992).

Three months prior to trial, Bailey had been granted additional counsel. About a month or more before trial, Bailey had had made available to him a forensic psychologist, a forensic pathologist and an addictionologist. And at least a week before trial, the court authorized a blood, hair and fiber expert.

Bailey points to no prejudice on account of the dates of authorization of the experts except perhaps that his attorney may have been inconvenienced. The record does not show even that except by argument. We are of opinion the district court did not abuse its discretion in the order or dates of authorization of such services and that without prejudice there can be no constitutional violation. **8** Bailey's argument is without merit.

Bailey also argues that the district court erred in disclosing to the prosecution information revealed to it in the ex parte motion made under 18 U.S.C. § 3006A. Subsection (e) of that code section provides for application for investigation and expert services through "an ex parte application."

While the various applications for services were made ex parte, the district court, on April 18, 1995, unsealed the motion papers for the ex parte motions made to secure the services mentioned above.

The government, however, correctly points out that with less than a month remaining for trial, the defendant had been detained and the trial had been continued once on motion of the defendant. The defendant had provided no discovery pursuant to the standard discovery

_____

**8** We do not imply that any prejudice which may exist brings on a constitutional violation.

15

order and, although the defense intended to introduce expert testimony with respect to Bailey's mental condition pursuant to Fed. R. Crim. P. 12.2, the notice of intention to use such testimony had not been filed. For that reason, the court unsealed the ex parte motions and ordered both sides to immediately disclose all Jencks statements. Following that, the United States was able to have Bailey undergo a psychiatric examination and the trial proceeded as scheduled on May 16, 1995.

The government even agrees that if no ameliorating factors were present in this case, the district court should not have unsealed the ex parte motions. The government argues, however, that under the facts of this case above related, the district court was justified in unsealing the motions, and we agree. In all events, Bailey is unable to point to any prejudice by the unsealing of the motions except that the mental processes of the defense attorneys may have been revealed by them. We do not believe this is sufficient and that a more concrete application to the case must be present to show prejudice, if any there be.

D. Continuance

Bailey's last argument with respect to the procedural conduct of the case is that he was denied a motion for a continuance made on May 12, 1995, the Friday before the trial was to begin on Tuesday, May 16, 1995. The argument on appeal is that he did not have sufficient time to utilize an expert which had only been authorized one week prior to trial. The witness we refer to here was what Bailey calls a "hair, blood and fiber" expert.

Bailey moved for such an expert on April 27, 1995, and the court set a hearing on that motion for May 3, 1995. But at Bailey's request, the court rescheduled the hearing for May 5, 1995. Following that hearing on May 5th, although Bailey's attorney was absent from the hearing, the court on May 9th entered its written order authorizing the hair, blood and fiber expert. At this point, it is well to say that Bailey's attorney had previously talked to that expert but did not have the money to pay the expert until after May 5. The attorney had also, previous to May 5, turned over to the expert the evidence of the government with respect to hair, blood and fiber. The motion for a continuance stated that the expert had made a preliminary report but

16

there was not time to make a fuller report before the date the motion for a continuance was filed. Notably, a copy of the report is not a part of the record and apparently it was not shown to the district judge. Also, notably, at oral argument the attorney claimed the expert witness had a convention in Cincinnati during the trial. Of course, the absence of a material witness is a standard reason for continuance. The district court, however, was not notified of the convention in Cincinnati so far as the record we have shows. Also, it is now acknowledged that Mrs. Bailey was in fact in the trunk of Bailey's car, and the only materiality of any testimony the expert witness might have given would go to when she was placed in the trunk, rather than whether she was placed in the trunk. We are also not told what the expert would have testified to had he been called as a witness, which he was not. In view of all of these facts, we are of opinion the district court did not abuse its discretion in denying the continuance.

E. The district court did not abuse its discretion in refusing a change of venue or individual voir dire

On April 13, 1995, pursuant to Federal Rule of Criminal Procedure 21(a), Bailey filed a motion for a change of venue to a different division within the district, or alternatively, outside of the Southern District of West Virginia. Bailey claimed that due to the quantity and the prejudicial quality of the press coverage it was impossible for him to obtain a fair trial in that district, and more specifically, in the cities of Charleston or Huntington, West Virginia. At a May 5, 1995 motion hearing, after listening to testimony from members of the press as to the amount of coverage the events had received, the court denied the motion, which Bailey renewed on May 16th during the voir dire examination of the jurors.

In considering the motion for a change of venue, the district court complied with the two-step analysis which we discussed in United States v. Bakker, 925 F.2d 728 (4th Cir. 1991). Bakker calls for first addressing whether the publicity is so inherently prejudicial that trial proceedings must be presumed to be tainted and, if that be not true, then the second step is to conduct a voir dire examination of prospective jurors to determine if actual prejudice exists. Bakker at 732.

At the May 5th hearing, representatives of all the press testified: radio, television and newspapers. At that hearing the representatives

17

of the press presented by Bailey repeatedly conceded that the case was given no more, and indeed in some instances less, attention and exposure in the media than other high profile federal cases. There was evidence, for example, that in the intervening six months between the temporary disappearance of the couple and the trial, one local television station aired a total of 15,000 news items, only 30 of which concerned this case. The district court found that the attention received did not rise to the level of presumed prejudice against the defendant, and denied the motion for a change of venue orally on May 5th and entered its order on May 9th.

During the empaneling of jurors on May 16th, the district court proceeded to the second step of determining if there was actual prejudice to the defendant from media items. Bakker , 925 F.2d at 732.

Here, the parties were permitted in advance to submit questions for potential jurors and there is no complaint that the district court failed to ask any question. The complaint is that the court did not permit the individual examination of the jurors on the issue of pre-trial publicity.

In response to the questions asked, some jurors admitted that they would not be able to render an unbiased opinion. They were excused. After most or all of the potential jurors responded by a show of hands that they had heard or read of the case through the press, the court specifically asked the potential jurors if anything they had heard would predispose them to favor one side or the other. After receiving a negative response, the court couched the same question in other language:

> do any of you feel that you would be unable to reach a verdict in this case solely based on the evidence as it comes in in this courtroom and the law as I give it to you at the -- during and at the conclusion of the case?

Again the responses were negative. The court proceeded to excuse two potential jurors who indicated in response to another question that their experience with family violence would bias their opinion. Then, for the first time, the defendant made his request for individual voir dire, and renewed his motion for a change of venue. The court declined to permit individual voir dire and denied the motion.

18

The record shows that the district court conducted thorough questioning that was both fair and impartial. It asked all or substantially all of the questions given to it in advance by the defendant. The record shows that the district court excused every juror whose opinion or inclination showed that he could not render a fair and impartial verdict. The fact that the court did not permit individual voir dire examination of jurors was not error. "It is well established that a trial judge may question prospective jurors collectively rather than individually." Bakker at 734. And we note that the district judge did question individually those jurors whose initial responses were less than satisfactory. Bakker at 734.

In conducting voir dire, a district court has broad discretion. United States v. ReBrook, 58 F.3d 961, 969 (4th Cir.), cert. denied, 64 U.S.L.W. 3332 (1995). The consideration of a change of venue is also measured under the standard of abuse of discretion. Bakker at 732. In this case, we are of opinion the district court did not abuse its discretion in either instance. It followed the two-step analysis set out in Bakker and the record supports its action.

F. Admissibility of Evidence

Bailey complains that evidence with respect to the lid and latch on the trunk of his car, of blood and urine in the trunk, photographs of his wife upon her admission to the hospital in Kentucky, and her prognosis for recovery, even if relevant, should have been excluded under Rule 403 because the probative value was outweighed by unfair prejudice. We are of opinion the evidence was relevant. Again, this is a matter under Rule 403 committed to the discretion of the district court, and we are of opinion it did not abuse its discretion. United States v. Aramony, 88 F.3d 1369, 1378 (4th Cir. 1996).

G. Prosecutorial Abuse

We are of opinion there was no error in the cross-examination of Dr. Biundo with respect to the cause of anoxia or in the cross-examination of Bailey. Neither do we think there was error in the closing argument of the government.

19

H. Sufficiency of the evidence

Finally, as to the merits and procedural aspects of the trial, Bailey argues that the evidence does not support the verdict.

We need not discuss this at any great length. We rely on the statement of facts in this opinion and hold that the evidence does support the verdict on each count.

I. Sentencing

Bailey appeals the district court's upward departure from the standard guideline sentence for kidnapping.

After considering the presentence report, the court determined that for the kidnapping offense the defendant's base offense level was 30, and that with his criminal history category of III this warranted a sentencing range of 121 months to 151 months. Although the guidelines do not have a specific provision for the interstate domestic violence conviction, the court likened it to aggravated assault, and, finding the base offense level for that offense to be lower than the kidnapping offense level, the court took the kidnapping offense level as the appropriate total offense level. The court then found that aggravating circumstances existed "of a kind and to a degree not adequately taken into account by the Sentencing Commission when it promulgated the guidelines." The court proceeded to explain at length the five aggravating factors which it found. The written justification of the upward departure succinctly sets forth each of the aggravating factors and the corresponding guideline section permitting an increase in the sentence. They may be summarized as follows, the first four being encouraged factors under United States v. Koon, 64 U.S.L.W. 4512, 4516 (1996).

(1) Mrs. Bailey suffered a massive, permanent and life-threatening injury to her total body function of a kind and degree not contemplated by the guidelines. See U.S.S.G. §5K2.2 (Physical Injury).

(2) The intentional and brutish conduct on the part of the defendant, including depriving her of medical attention for a period of days

20

and confining her in an automobile trunk is the type of extreme conduct that warrants an increased sentence pursuant to U.S.S.G. §5K2.8 (Extreme Conduct) and §5K2.2 (Physical Injury).

(3) The guidelines do not adequately take into account the massive economic losses to the victim and defendant's inability to compensate her. See U.S.S.G. §5K2.5 (Property Damage or Loss).

(4) Less significantly, restraint of the victim by binding her ankles after inflicting upon her massive incapacitating injuries, warrants departure under U.S.S.G. §5K2.4 (Abduction or Unlawful Restraint).

(5) Finally, "but somewhat more attenuated" than the foregoing factors, the injuries and suffering of the victim were perpetrated or aggravated through the use of an automobile when the defendant was under a lifetime suspension of his driving privileges due to prior driving offenses involving alcohol.[9]

The district court found that these circumstances required sentencing the defendant to the maximum sentence allowed for each count: life imprisonment for the kidnapping conviction, and a concurrent 20 year sentence for the interstate domestic violence conviction.

The first objection Bailey makes to his sentencing is that the extent of departure made by the district court was unreasonable. Whether or not any such departure was unreasonable, we think is measured by the standard of abuse of discretion, and we are of opinion that the district court did not abuse its discretion in the extent of departure in this case. See Koon, 64 U.S.L.W. at 4517. Absent torture or something similar, more serious injuries than those suffered by Mrs. Bailey are hard to imagine.

_____

[9] This would be an unmentioned factor under Koon, 64 U.S.L.W. at 4516. We need not consider it, for the departure should be affirmed in consideration of the other factors mentioned just above. We are persuaded the district court would have imposed the sentence absent the factor involving using the automobile on a revoked permit. United States v. Kochekian, 977 F.2d 905, 906 (4th Cir. 1992).

21

Bailey then objects to each ground of departure used by the district court, sections 5K2.2, 5K2.4, 5K2.5 and 5K2.8. As to each of those grounds, he objects that certain of the facts depended on by the district court are clearly erroneous: Mrs. Bailey spending several days in the closed trunk of the car,[10] and Mrs. Bailey being exposed to exhaust fumes or suffering oxygen deprivation under 5K2.2; and Mrs. Bailey's ankles being tied under 5K2.4. It suffices to say that we are of opinion that those fact findings are supported by the record and are not clearly erroneous. So far as Bailey depends on the same claim of clearly erroneous fact finding for his objection to the grounds under 5K2.8, it is also not well taken for the same reason.

Bailey objects to the consideration of § 5K2.2, Physical Injury, as a ground for upward departure because § 2A4.1(b)(2) of the guidelines under kidnapping provides for a four-level increase if the victim sustained permanent or life-threatening bodily injury. The district judge utilized this four-level increase. That, however, does not obviate the use of § 5K2.2, physical injury, which provides, in pertinent part:

> The extent of the increase ordinarily should depend on the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked. When the victim suffers a major, permanent disability and when such an injury was intentionally inflicted, a substantial departure may be appropriate.

The facts in this case show without a doubt that Mrs. Bailey suffered a major, permanent disability. She is now comatose and may well remain that way, not to mention numerous other permanent disabilities. The district court found:

> The magnitude of Mrs. Bailey's injuries were exacerbated by the defendant's intentional, knowledgeable, brutish conduct in transporting her for a six-day period in a closed trunk of a moving automobile without providing her ade-

---

[10] The district court, at the sentencing hearing, modified the phrase "over the next six days" to "for an undetermined time." This correction should apply throughout.

22

quate care, medical care when she was subject to extreme oxygen deprivation and to exhaust fumes. . .

We also note that in finding that more than minimal planning attended this crime, the district court found that the defendant "could have sought medical care to alleviate her condition immediately and locally, but he chose not to." We are of opinion that these findings are not clearly erroneous and support the district court's use of § 5K2.2 as a ground of departure.

Bailey's next objection is to the use of § 5K2.4, Abduction or Unlawful Restraint. The argument goes that since the crimes of kidnapping and domestic violence contain the elements of abduction and unlawful restraint, a departure on account of the same is not authorized. The district court found that the fact that the victim's ankles were bound while in the trunk of the car was a reason to utilize § 5K2.4, although less significant than the extent of her other injuries, it stated:

> [A]fter suffering massive, incapacitating injuries at the hands of the Defendant [Mrs. Bailey] was further restrained by the Defendant as evidenced by the scarring by a rope or other implement used to bind her ankles. Considering the conditions in the trunk of the car and the victim's injuries, this additional restraint is particularly egregious and also sufficient to warrant a departure based on 5K2.4.

The fact finding of the district court in this respect again was not clearly erroneous and we agree with its legal conclusion.

With regard to basing the departure on the encouraged factors of 5K2.2 (Physical Injury) and 5K2.4 (Unlawful Restraint), Bailey also objects that these bases are inherent in the underlying offenses. He asserts that the specific guidelines for kidnaping and interstate domestic violence (by analogy to aggravated assault), include, or sufficiently take into account, those bases for departure. However, the district court addressed this concern when it considered the aggravating circumstances.

23

The sentencing court noted, for example, with regard to 5K2.2 (Physical Injury) that the defendant's conduct resulted in "62 permanent and life threatening injuries -- and I would say that in the plural -- of a kind and degree not contemplated by the example set forth in the guideline." As to 5K2.4 (Unlawful Restraint), again, for example, the district court observed that the defendant "further restrained" Mrs. Bailey by binding her and enclosing her in the trunk, after she had suffered massive incapacitating injuries, and that this was "particularly egregious."

The Court's recent decision in Koon regarding the use of encouraged bases for departure in cases in which the factor has been taken into account or which is inherent in the offense provides for departure

> only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense.

Koon, 64 U.S.L.W. at 4516 (quoting U.S.S.G.§ 5K2.0). At sentencing on September 1, 1995 the district court did not have the benefit of Koon, which was decided January 13, 1996, and so did not make this specific finding. We construe, however, the district court's finding of multiple permanent and life-threatening physical injuries, as well as its emphasis on the egregious nature of the restraint, to indicate that the court found each factor "present to a degree substantially in excess of that which ordinarily is involved in the offense" of both kidnaping or interstate domestic violence, as required by Koon. Accordingly, Bailey's objection is not well taken.

Bailey's next objection is to a departure under§ 5K2.5, Property Damage or Loss. Section 5K2.5 provides that if property damage was not taken into account within the guidelines, the court may increase the sentence above the guideline range. Bailey argues that the four-point adjustment for a permanent or life-threatening bodily injury mentioned in § 2A4.1(b)(2) obviates the use of§ 5K2.5, for, he argues, in every case involving serious injury there will always be involved significant medical expenses.

Nowhere in the guidelines is anything mentioned about medical expenses and we think the district court was correct in referring to them here. They are obviously massive, amounting at the least to

24

thousands of dollars and, more likely, hundreds of thousands of dollars or even more.

Bailey's last objection to sentencing is the use of§ 5K2.8, Extreme Conduct. He argues that the facts underlying that finding made by the district court are clearly erroneous, which we have disposed of above. That guideline provides for a departure "if the defendant's conduct was unusually heinous, cruel, brutal, or degrading to the victim . . . ." It continues, "examples of extreme conduct include torture of a victim, gratuitous infliction of injury or prolonging of pain or humiliation." The district court found in connection with § 5K2.8, as well as § 5K2.2 that Bailey's intentional brutish conduct in transporting Mrs. Bailey for several days in the closed trunk of a moving automobile without adequate medical care and exposing her to extreme oxygen deprivation and exhaust fumes and with no attention to her personal needs constituted extreme conduct, and we agree. Even in the light most favorable to Bailey, this was gratuitous infliction of injury and prolonging of pain and humiliation, not to mention conduct heinous, cruel, brutal and degrading to the victim.

In sum, the district court found that no offense level lower than forty-three, calling for life imprisonment, would suffice to punish the defendant adequately for his conduct and to incapacitate him and prevent him from injuring others in similar circumstances and to deter others from engaging in similar heinous conduct. We agree.

The judgment of the district court is accordingly

AFFIRMED.

25