**IN THE SUPREME COURT OF THE STATE OF IDAHO**
Docket No. 50452

| STATE OF IDAHO, | ) | |
|---|---|---|
| | ) | |
| Plaintiff-Respondent, | ) | Boise, April 2025 Term |
| | ) | |
| v. | ) | Opinion Filed: July 17, 2025 |
| | ) | |
| CLYDE K. EWING, IV, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| Defendant-Appellant | ) | |
| | ) | |

Appeal from the District Court of the Second Judicial District of the State of Idaho, Nez Perce. Jay P. Gaskill, District Judge.

The district court's judgment of conviction is <u>affirmed</u>.

Erik Lehtinen, State Appellate Public Defender, Boise, attorneys for Appellant. Andrea Reynolds argued.

Raúl R. Labrador, Idaho Attorney General, Boise, attorneys for Respondent. Mark Olson argued.

———————————————————

BEVAN, Chief Justice.

Clyde K. Ewing appeals from his judgment of conviction for first-degree felony murder, committed during the perpetration or attempted perpetration of a robbery and/or burglary. Clyde argues the district court: (1) erred in denying his motion to dismiss based on a violation of his statutory right to a speedy trial; (2) violated his rights under the Confrontation Clause of the Sixth Amendment by permitting the prosecutor to introduce a video recording of a police interview of a witness who died before trial; (3) abused its discretion in admitting as substantive evidence a compilation video prepared by a police officer, with symbols and notations added by the officer; and (4) deprived Clyde of a fair trial because these errors, taken together, constitute cumulative error. For the reasons below, we affirm the judgment of conviction.

1

# I.  FACTUAL AND PROCEDURAL BACKGROUND[1]

## A. Factual Background

In the early morning hours of January 8, 2021, two people dressed in black entered Samuel Johns' residence through the kitchen door. Patrycia Labombard, a visitor to the house, saw the two assailants enter, and she testified that one of them was armed with a handgun. She described one of the assailants as a teenaged girl or young woman. Labombard stated that one assailant tried to restrain her with a zip tie while the other assailant went further into Johns' residence. Labombard told police that the assailant who restrained her was "about six inches taller than her." Labombard slipped out of the zip ties and then hid in the bathroom with the door shut. She described hearing a fight, yelling, shouting, and then gunshots in the other room.

Labombard then heard the assailants leave out the kitchen door. After the assailants left, Labombard went to the living room and saw Johns lying on the floor with gunshot wounds. There were seven other people in the house, though none reportedly witnessed the shooting. Johns died from his injuries.

That evening, officers began to interview the seven other people who were in the house at the time of the shooting, including Debra Moffat, Johns' mother. Police interviewed Johns' friends and family, who told police that they believed the two people who had shot Johns were 42-year-old Clyde Ewing and 16-year-old Demetri Ewing, Clyde's son. This belief was based on an on-going dispute over a stolen pistol belonging to Clyde's brother, Christopher Higheagle, and a stolen backpack. Police later interviewed Christopher and Virginia Higheagle, Clyde's brother and sister. Virginia reported to police that her family believed Clyde and Demetri had killed Johns, noting that Clyde had been causing problems in the family. Virginia also believed that Clyde had broken into her and Christopher's residence to steal the pistol and backpack. Virginia informed police that Clyde and Demetri were staying nearby at the Hacienda Lodge in Clarkston, Washington, where she had seen two black bicycles in their room.

Police secured a search warrant for Johns' residence and began recovering physical evidence from the scene and collecting surveillance videos from cameras in the area. Among the

---

[1] The factual background in this appeal is identical to the factual background in the companion appeal, *State v. Ewing*, Docket No. 50700. However, because the cases were severed before trial, the procedural histories are distinct.

scenes discovered on the video surveillance were footage of two individuals, dressed in black, riding mountain bikes in the area of Johns' house the night he was murdered.

On January 12, 2021, Clyde and Demetri were arrested without a warrant in Clarkston. Law enforcement subsequently obtained a search warrant for Clyde's and Demetri's room at the Hacienda Lodge and they seized several items, including a black backpack with a spent aluminum 9 mm bullet casing at the bottom of it. Police also located black zip ties, electrical and duct tape, black clothing, and black mountain bikes. On January 13, 2021, Lewiston police subsequently sought and obtained an Idaho arrest warrant for Clyde and Demetri.

## B. Procedural History

The State charged Clyde with first-degree felony murder during the perpetration of, or an attempt to perpetrate, a robbery or burglary on May 17, 2021. He was arraigned on May 20, 2021. Demetri was charged with the same crime and arraigned a day earlier. While both cases were initially joined for trial, each defendant retained separate counsel and filed separate motions and responses, though the trial court heard many of the matters jointly.

There were voluminous pretrial motions and pleadings filed before the case advanced to a jury trial. Relevant to this appeal was a September 24, 2021, motion to dismiss that Clyde filed asserting his right to a speedy trial. A few days before Clyde's motion, the district court vacated his October 4, 2021, trial following an order from the Idaho Supreme Court regarding COVID-19, which temporarily suspended jury trials. Demetri then moved to dismiss on the same grounds, and the district court later issued an opinion and order "applicable to both Defendants' cases," denying the motions to dismiss. The district court concluded that the orders entered by the Administrative Judge of the Second Judicial District and the amended order entered by the Idaho Supreme Court on June 25, 2021, tolled the speedy trial deadline calculations for Clyde's and Demetri's trials. Identifying those deadlines, the district court found:

> Trial was first set to commence on September 20, 2021. This date was well within the six-month time frame as required by I.C. § 19-3501. The next trial was October 4, 2021, which also fell within the six-month time frame. In October, the incidences of COVID-19 positive tests in Nez Perce County were on the rise. The trial was reset to February 7, 2022, but trial was again postponed due to incidences of positive Covid cases in Nez Perce County. The trial is currently scheduled to begin on April 11, 2022. As a result of the Administrative Orders set forth above, the Defendants' right to a speedy trial has been tolled for a significant number of days. The current trial date will commence before the expiration of the speedy trial time frame set forth in I.C. § 19-3501(2), based upon the number of days that were tolled.

Clyde's trial was reset for May 16, 2022. Clyde filed a second motion to dismiss, arguing that the May 16, 2022, trial date again violated his right to a speedy trial. Applying the same reasoning, the district court denied his motion.

In preparation for trial, the State filed two motions in limine. First, the State sought to admit a video recording of an interview between Detective Joe Stormes and Moffat; Moffat died before trial. Clyde objected to the State's motion, arguing he had not had the opportunity to cross-examine Moffat, which violated the Confrontation Clause, and her statements were hearsay. Following oral argument, the district court granted the State's motion in limine to admit the video interview.

The State also filed a motion in limine to admit a compilation video at trial as an exhibit. The video was compiled by Brian Birdsell, a Lewiston Police Department employee. The video contained a "series of videos" that were recorded the night of Johns' murder, showing the route the State intended to argue Clyde and Demetri traveled when going to and from Johns' house. The video included maps, notations, and "call outs" that were added by law enforcement.

In its motion, the State argued the compilation was admissible because the individual videos and notations within the compilation could be authenticated under Idaho Rule of Evidence 1006. Clyde objected to admitting the compilation. Though the district court initially withheld a ruling on the State's motion, it ultimately admitted the compilation at trial. Birdsell testified as the video was played for the jury. Clyde renewed a motion to sever his case from Demetri's, which the court granted before trial. Clyde's case proceeded to a five-day jury trial, beginning on May 16, 2022. Clyde was later found guilty of first-degree murder and sentenced to life in prison, without the possibility of parole. Clyde appealed.

## II. ISSUES ON APPEAL

1. Did the district court err in denying Clyde's motion to dismiss for violation of his right to a speedy trial?

2. Were Clyde's rights under the Confrontation Clause violated?

3. Did the district court abuse its discretion in admitting as substantive evidence a compilation video prepared by a police officer containing symbols and notations?

4. Has Clyde shown cumulative error?

## III. STANDARDS OF REVIEW

"The granting or denial of a motion to dismiss is reviewed for an abuse of discretion." *State v. Roth*, 166 Idaho 281, 283, 458 P.3d 150, 152 (2020) (citation omitted). "When reviewing the trial court's evidentiary rulings, this Court [also] applies an abuse of discretion standard." *State v.*

4

*Smalley*, 164 Idaho 780, 783, 435 P.3d 1100, 1103 (2019) (citation omitted). Under the standard, this Court conducts its review by considering four essentials: "'whether the trial court: (1) correctly perceived the issue as one of discretion; (2) acted within the outer boundaries of its discretion; (3) acted consistently with the legal standards applicable to the specific choices available to it; and (4) reached its decision by the exercise of reason.'" *State v. Bodenbach*, 165 Idaho 577, 591, 448 P.3d 1005, 1019 (2019) (quoting *Lunneborg v. My Fun Life*, 163 Idaho 856, 863, 421 P.3d 187, 194 (2018)).

"Whether there was an infringement of [a defendant's] . . . right to a speedy trial presents a mixed question of law and fact." *State v. Ish*, 173 Idaho 930, 551 P.3d 746, 756–57 (2024) (quoting *State v. Clark*, 135 Idaho 255, 257, 16 P.3d 931, 933 (2000)). "We defer to the trial court's 'findings of fact if supported by substantial and competent evidence. This Court, however, exercises free review of the trial court's conclusions of law.'" *Id.* (quoting *Clark*, 135 Idaho at 257, 16 P.3d at 933).

## IV.   ANALYSIS

### A.   The district court did not abuse its discretion by denying Clyde's motion to dismiss on speedy trial grounds.

Clyde's first argument on appeal focuses on alternative theories concerning the COVID-19 pandemic and the temporary suspension of jury trials. First, Clyde challenges whether this Court and the Administrative Judge for the Second Judicial District had the authority to toll the time limit to calculate speedy trial rights. Second, even if the orders could toll the time limit, Clyde maintains that the orders did not constitute good cause for his trial to be delayed. Specifically, Clyde maintains that the district court should have analyzed the factors under Idaho Criminal Rule 28 to determine whether good cause existed for the delay. The State responds that both orders lawfully suspended jury trials and tolled the speedy trial time limit under Idaho Code section 19-3501(2). The State also argues that the district court correctly found that the global pandemic constituted good cause for delay beyond the time limit imposed under Idaho Code section 19-3501(2). We agree that the global pandemic constituted good cause for the delay.

The Sixth Amendment to the United States Constitution and Article 1, Section 13 of the Idaho Constitution guarantee a criminal defendant the right to a speedy trial. Specific time limits for a speedy trial are set forth in Idaho Code section 19-3501:

> The court, unless good cause to the contrary is shown, must order the prosecution or indictment to be dismissed, in the following cases:

5

. . .

      (2) If a defendant, whose trial has not been postponed upon his application, is not brought to trial within six (6) months from the date that the information is filed with the court.

I.C. § 19-3501(2)

Below, Clyde filed two motions to dismiss, arguing that his statutory speedy trial rights were violated. Clyde's motions, while acknowledging that this Court and the Administrative Judge for the Second Judicial District had issued orders that temporarily suspended jury trials, argued that those orders were "illegitimate" and issued "without jurisdiction" or "consideration of the rights abridged or the necessity for doing so." The district court denied both of Clyde's motions.

On appeal, Clyde's argument in support of his claim that this Court lacks authority to suspend jury trials is sparse. Clyde argues that the pandemic did not give this Court authority to overwrite substantive law. Clyde maintains that Idaho Code section 19-3501 is a substantive statute, and "when there is a conflict between a court rule and a statute on a substantive point of law, 'the statute will prevail.' " *State v. Garner*, 161 Idaho 708, 711, 390 P.3d 434, 437 (2017).

Idaho Code section 19-3501 provides that an indictment must be dismissed if the defendant is not brought to trial within six months, "*unless good cause to the contrary is shown*[.]" I.C. § 19-3501(2) (emphasis added). This Court promogulated Idaho Criminal Rule 28 to define good cause under Idaho Code section 19-3501: "When considering whether good cause exists in ruling on a motion to continue a trial or a request to dismiss which is based upon the time requirements set forth in section 19-3501, Idaho Code, in exercising its discretion, the court shall consider the following factors . . . ." I.C.R. 28. "This Court's jurisprudence and the Idaho Constitution, Article V, section 2, make it clear that this Court 'has the inherent power to make rules governing the procedure in all of Idaho's courts.'" *State v. Oldenburg*, 173 Idaho 55, 538 P.3d 1054, 1056 (2023) (quoting *State v. Weigle*, 165 Idaho 482, 486, 447 P.3d 930, 934 (2019)). Given our inherent power to make rules governing court procedure, *id.*, and section 19-3501's express recognition that good cause can exist to deviate from the six-month speedy trial timeframe, our orders did not violate the separation of powers.

Relatedly, Clyde argues that the COVID-19 orders from the Idaho Supreme Court and the Administrative Judge of the Second Judicial District did not constitute good cause. This Court has already considered this issue and rejected Clyde's position. *See State v. Mansfield*, ___ Idaho ___, ___, 559 P.3d 1177, 1191 (2024); *State v. Ish*, 174 Idaho 77, 551 P.3d 746, 759 (2024). As

addressed above, Idaho Criminal Rule 28 identifies the factors that a court shall consider when evaluating whether there is good cause under section 19-3501:

> 1. the length of the delay beyond the statutory timeframe;
>
> 2. whether there have been prior continuances and the reasons therefore;
>
> 3. the reason(s) for the current delay, including but not limited to: whether the delay was necessary to safeguard the health or safety of the parties, jurors, attorneys, witnesses, court staff, or the public, and *whether the delay was necessitated by the declaration of an emergency by the President of the United States or the Governor of the State of Idaho*;
>
> 4. whether and when the accused requested compliance with the statutory trial time requirements;
>
> 5. the prejudice, if any, to the accused of permitting the prosecution to proceed beyond the statutory trial time requirements; and,
>
> 6. *any other factor the court deems relevant*.

I.C.R. 28 (emphasis added).

In denying Clyde's motions to dismiss for violation of his statutory right to a speedy trial, the district court stated that the orders issued by this Court and the Administrative Judge of the Second Judicial District "establish good cause for the delay of the trial date," and noted that it was "unnecessary to weigh the factors set forth in I.C.R. 28." Given the mandatory language in the Rule, the district judge should have considered the Rule 28 factors. However, its failure to do so does not mandate reversal here because the reason for the delay, the COVID-19 pandemic, is well-defined and constitutes good cause on its face. *See State v. Sherwood*, 49785, 2025 WL 1788283, at *6 (June 30, 2025) ("the COVID-19 pandemic . . . is well-defined and constitutes good cause on its face"). Indeed, this Court has repeatedly held that the COVID-19 emergency orders "constituted a justifiable reason for a delay under a constitutionally based speedy trial analysis because of the need to 'protect[ ] the health of all trial participants during a global pandemic.'" *Mansfield*, __ Idaho at __, 559 P.3d at 1188 (quoting *Ish*, 173 Idaho at 551 P.3d at 759–60). Thus, we hold that the district court did not abuse its discretion.

In the same vein, Clyde maintains that the State did not meet its burden to show good cause because it never argued that good cause existed based on the factors set forth in Rule 28. This Court's and the Administrative Judge for the Second Judicial District's emergency orders fulfilled that burden, without the State's reliance on Rule 28 for support. The district court found that the Idaho Supreme Court's emergency orders constituted good cause to toll the time limits within

which to hold Clyde's trial. For the reasons articulated above, we affirm the district court's decision.

**B.    Clyde's rights under the Confrontation Clause were violated, but the error was harmless.**

The State filed a motion in limine in December 2021 to admit statements that Moffat made in an interview with Detective Stormes of the Lewiston Police Department. The State argued the statements were admissible because Moffat died before trial and was unavailable to testify. Clyde objected, arguing that the statements from Moffat violated his rights under the Confrontation Clause because he did not have the opportunity to cross-examine her. He also argued that the video interview was hearsay. The district court issued an opinion and order granting the State's motion. The court found: "Moffat was present in the room where Samuel Johns was shot, she heard the voice of an assailant as well as the shooting. There are circumstantial guarantees of trustworthiness, including those similar to a present sense impression. Overall, the requirements set forth above have been met."

The Confrontation Clause of the Sixth Amendment gives a criminal defendant the right "to be confronted with the witnesses against him." U.S. CONST. amend. VI. "Whether admission of evidence violates a defendant's right to confront adverse witnesses under the Sixth Amendment's Confrontation Clause is a question of law over which this Court exercises free review." *State v. Stanfield*, 158 Idaho 327, 331, 347 P.3d 175, 179 (2015).

"The United States Supreme Court has recognized that 'a statement cannot fall within the Confrontation Clause unless its primary purpose was testimonial.'" *State v. Spencer*, 169 Idaho 505, 512, 497 P.3d 1125, 1132 (2021) (quoting *Ohio v. Clark*, 576 U.S. 237, 245 (2015)). "Some statements are categorically testimonial: ex parte in-court testimony or its functional equivalent, extrajudicial statements in formalized testimonial materials, or 'statements made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* (quoting *Crawford v. Washington*, 541 U.S. 36, 51–52 (2004)). "'Testimony' is '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Id.* (quoting *Crawford*, 541 U.S. at 51).

The State concedes that the statements should have been excluded because they were testimonial under the Confrontation Clause, and Clyde had no opportunity to cross-examine Moffat. That said, the State argues that, because Clyde did not argue below that the district court's

admission of the videotaped interview violated the Confrontation Clause under *Crawford*, his objection now made on appeal was not preserved and his argument must be analyzed under the fundamental error standard. Alternatively, the State argues that any error is harmless beyond a reasonable doubt because a review of the record reveals that the constitutional violation did not contribute to the jury's verdict.

*Crawford*, decided over 20 years ago, remains the seminal case interpreting the Confrontation Clause. Remarkably, neither the State nor the district court cited *Crawford* below. In *Crawford*, the United States Supreme Court recognized that testimonial statements by witnesses who do not appear in court cannot be introduced into evidence without violating a defendant's right to confrontation. *Crawford*, 541 U.S. at 51; *see State v. Stanfield*, 158 Idaho 327, 332, 347 P.3d 175, 180 (2015) (citing *Davis v. Washington*, 547 U.S. 813, 823–24 (2006) and *Crawford,* 541 U.S. at 51). "If the statement is testimonial, then its admission is permitted only if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine the declarant." *Stanfield*, 158 Idaho at 332, 347 P.3d at 180 (citing *Crawford*, 541 U.S. at 59, and *State v. Hooper*, 145 Idaho 139, 143, 176 P.3d 911, 915 (2007)).

While the State is correct that Clyde did not cite *Crawford*, Clyde advocated for Moffat's statements to be excluded "because the statement is not more probative than the statements by eyewitnesses." Specifically, related to Moffat's statements to Detective Stormes, Clyde argued that her statements were "not more probative than the statements of Ms. Labombard." The language Clyde used to make this argument incorporates *Crawford*, and its analysis of whether or not a statement is testimonial. *See Crawford*, 541 U.S. at 36); *see also Stanfield*, 158 Idaho at 333, 347 P.3d at 181 (quoting *Davis,* 547 U.S. at 828) ("a statement is testimonial when it is intended to be 'a weaker substitute for live testimony at trial.'"). Clyde then made a contemporaneous objection at trial to the district court's decision to admit the video "based on our [objection to the State's] motion in limine[,]" which argued that the video "violate[d] the Confrontation Clause[.]"

This Court has repeatedly clarified the preservation standard in criminal cases. In *State v. Miramontes*, 170 Idaho 920, 924–25, 517 P.3d 849, 853–54 (2022), we explained that an issue is preserved in a criminal case if the issue is presented with argument and authority, and noticed for a hearing, or if there is an adverse ruling. While this standard is strict, it is not so exacting as to penalize a litigant for not citing the most salient case law. Clyde's argument below challenged the admissibility of Moffat's testimony under the Confrontation Clause. As noted, *Crawford* has been

the prevailing standard on the question of whether a statement is testimonial for more than twenty years. While it is certainly much better practice to cite the relevant case law, Clyde's argument was sufficient to preserve the issue for appeal.

"When an alleged error is preserved by contemporaneous objection, as it was here, the harmless error test applies[.]" *State v. Weigle*, 165 Idaho 482, 489, 447 P.3d 930, 937 (2019) (citing *State v. Perry*, 150 Idaho 209, 221, 227, 245 P.3d 961, 973, 979 (2010), and *State v. Abdullah*, 158 Idaho 386, 438, 348 P.3d 1, 53 (2015)). Harmless error is "error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *State v. Garcia*, 166 Idaho 661, 674, 462 P.3d 1124, 1138 (2020) (citing *Yates v. Evatt*, 500 U.S. 391, 403 (1991)); *see also State v. Johnson*, 163 Idaho 412, 421, 414 P.3d 234, 243 (2018). When the effect of the error is minimal compared to the probative force of the record establishing guilt beyond a reasonable doubt, the error is harmless. *Id.* "Under the harmless error standard, the defendant has the initial burden of establishing an error, at which point the State has the burden of proving 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Abdullah*, 158 Idaho at 416, 348 P.3d at 31 (2015) (quoting *Perry,* 150 Idaho at 221, 227, 245 P.3d at 973, 979).

Clyde has met his initial burden that an error occurred. The State concedes as much. Thus, the burden shifts to the State to prove beyond a reasonable doubt that admitting the video did not contribute to Clyde's guilty verdict. The State has done so.

Moffatt stated that on the day Johns was killed, she was awakened by someone telling Moffat to put her face in the bed—she complied with the order. She heard a "pop pop" sound and then saw that Johns had been shot. Detective Stormes then asked if the voice of the intruder was "a man's voice," and Moffat responded, "no, it was a youngster, it was a younger person, it didn't sound female to me." Finally, Moffat relayed that she did not see the gun or the intruder's face. Indeed, as Clyde's counsel relayed, in downplaying the significance of Moffat's statements during the defense's closing argument, Moffat told Detective Stormes that "she didn't see anything," that she "heard [a] pop pop," and "that was all the information she provided."

The primary probative value of the video was Moffat's statement that one of the intruders sounded like a younger person and did not sound like a woman. This testimony was different from that of another witness from the home, Labombard, who testified that the intruder "sounded like a young woman" and tended to explain why Labombard's perception was mistaken.

10

Weighed against all other evidence presented by the State, the probative force of the error of admitting Moffat's statements was minimal when compared to the record as a whole. Aside from Moffat's statement, the State also introduced evidence of: (1) zip ties and tape found at the scene that matched zip ties and tape recovered from Clyde's and Demetri's motel room; (2) surveillance video of Clyde and Demetri purchasing the zip ties from a nearby store; (3) surveillance video of two individuals in dark clothing riding bikes near Clyde's and Demetri's motel room before and after the murder, depicting a voice saying, "I" or "You" "shot him Dad,"; (4) a receipt recovered in the Ewings' motel room for the purchase of two sweatshirts consistent with sweatshirt tags located near the site of the murder; (5) DNA and fingerprint evidence from the scene that matched DNA and fingerprint evidence recovered at the Hacienda Lodge; (6) spent shell casings uncovered in Clyde's and Demetri's motel room were a ballistic match to two casings found at Johns' house; and (7) gunshot residue on Clyde's and Demetri's clothing.

An expert, the president of a forensic consulting firm, testified about the physical similarities between the zip ties and tape found at the murder scene and the zip ties and tape found in the Ewings' motel room. A Clarkston police officer, who was familiar with the Ewings, testified that he believed he saw them, approximately one hour before the murder in Clarkston, wearing face masks, dressed in all dark clothing, and on mountain bikes. Clyde's brother, Christopher Higheagle, and his sister, Virginia Higheagle, both testified about a motive for the murder: specifically, how Clyde was obsessed with a backpack which was left to him by his deceased father, which he believed was stolen and was at the residence where the murder was committed. Johns' older brother testified that during the month before the murder, the Ewings were outside his house, but then left when Johns' brother "tried to catch up with them" and that during that same month, the house and two vehicles at the residence were vandalized with the spraypainted word, "bag." Virginia Higheagle also testified about this vandalism. Cans of spray paint of the same colors used to commit the vandalism were found in the Ewings' motel room.

The probative force of this evidence about the identity of the intruders weighs heavily against the force of the erroneously admitted testimony from Moffat. Indeed, "when the error of admitting [Moffat's statement about the gender/age of one of the intruders] is weighed against everything else the jury considered, as revealed in the record, the district court's error was harmless." *State v. Garcia*, 166 Idaho 661, 675, 462 P.3d 1125, 1139 (2020). As a result, we hold that the State has met its burden of establishing beyond a reasonable doubt that Moffat's testimony

11

did not contribute to the guilty verdict. Thus, while we hold that the district court erred in admitting the Moffat video, that error was harmless.

**C.     The district court did not abuse its discretion in admitting a compilation video that included symbols and notations.**

The State amassed videos from several surveillance cameras located between Clyde's and Demetri's motel and Johns' house, compiling them into one streamlined video. The State added maps and notations to the video, such as arrows. Clyde now contests the court's admission of the video on two grounds: First, the video was not a summary under Idaho Rule of Evidence 1006 and did not prove the contents of voluminous recordings. Second, the recordings in the compilation video could be conveniently examined in court, and thus a summary was unnecessary.

"The trial court has broad discretion in the admission and exclusion of evidence and its decision to admit evidence will be reversed only when there has been a clear abuse of that discretion." *State v. Diaz*, 170 Idaho 79, 83, 507 P.3d 1109, 1113 (2022) (quoting *State v. Lopez-Orozco*, 159 Idaho 375, 377, 360 P.3d 1056, 1058 (2015)). The interpretation of a court rule "must always begin with the plain, ordinary meaning of the rule's language" but may be tempered by the rule's purpose. *State v. Montgomery*, 163 Idaho 40, 44, 408 P.3d 38, 42 (2017).

Idaho Rule of Evidence 1006 provides:

> The proponent may use a summary, chart, or calculation to prove the content of voluminous writings, recordings, or photographs that cannot be conveniently examined in court. The proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place. And the court may order the proponent to produce them in court.

"As part of the rule, the underlying [recordings] upon which the summary relies must be shown to have been admissible. *Van Brunt v. Stoddard*, 136 Idaho 681, 686, 39 P.3d 621, 626 (2001) (citing *State v. Barlow*, 113 Idaho 573, 746 P.2d 1032 (Ct. App. 1987)). "[F]or a summary to be admissible, the source documents being summarized must also be admissible, and the party offering the summary must fulfill the procedural requirement of making the source documents reasonably available to the opposing party." *Reed v. Reed*, 137 Idaho 53, 57, 44 P.3d 1108, 1112 (2002) (citing *City of Idaho Falls v. Beco Const. Co., Inc.*, 123 Idaho 516, 524, 850 P.2d 165, 173 (1993)).

In its motion in limine, the State argued that the compilation video was admissible because each component of the underlying content within the video was admissible. At the hearing on the motion, the State asserted that Birdsell would testify to how he made the compilation and clarified

12

that the compilation would only summarize "what the video shows . . . in a form that would assist the trier of fact in understanding the testimony that Mr. Birdsell would be providing at trial."

The district court reserved a ruling on the State's motion but noted that "if the proper foundation is laid regarding each portion of the video, the State is permitted to show each original video and elicit testimony to assist the jurors in understanding locations of videos and times that the videos were captured." At trial, over Clyde's objection, the court ultimately admitted the video.

    *1.   Whether the video was a summary that proved the contents of voluminous recordings.*

This issue turns on the interpretation of "summary" under Rule 1006. As Clyde points out, the only Idaho case to interpret this portion of the Rule is *State v. Barlow*, 113 Idaho 573, 576, 746 P.2d 1032, 1035 (Ct. App. 1987). In *Barlow*, the Court of Appeals addressed the admissibility of an auditor's summary of a taxpayer's records considering what were then the newly enacted Idaho Rules of Evidence. 113 Idaho at 576, n.2 746 P.2d at 1025, n.2. The *Barlow* court remarked that "[o]ur Supreme Court has long permitted the admission into evidence of testimony summarizing numerous documents which could not be presented conveniently to the trier of fact." *Id.* at 576, 746 P.2d at 1025. The court also noted the language of Idaho Code section 19-411(5), that "permit[ted] use of summaries as evidence '[w]hen the original consists of numerous accounts or other documents which cannot be examined in court without great loss of time, and the evidence sought from them *is only the general result of the whole*.'" *Id.* (emphasis added).

From this, Clyde points to two reasons why the compilation video does not qualify as a "summary." First, stemming from the language in *Barlow*, Clyde argues that the video is not "only" the general result of the whole because it contains the officer's editorial comments, i.e., animated arrows, call-outs, and maps. Specifically, Clyde notes that the compilation included notations that read "Leaving Clarkston," "Entering Clarkston," and "Returning to Clarkston." These notations, according to Clyde, were a narrative that told the jury how to interpret the videos. Second, Clyde asserts the video itself is not "the general result of the whole" because it is made up of video clips taken *from* voluminous recordings rather than a summary that proves the contents *of* voluminous recordings.

To Clyde's first contention, the State notes that, with Birdsell testifying on direct and cross-examination about the information contained within the video, the maps, call-outs, and other editorial additions were no different than if Birdsell had pointed at or otherwise emphasized certain segments of the video during his testimony, explaining the reason for such emphasis. In support

13

of its argument that the notations and graphics included on the compilation video did not render the exhibit inadmissible, the State points to *United States v. Moore*, 843 Fed. Appx. 498, 504 (4th Cir. 2021) (unpublished)[2]. In an appeal from his robbery conviction, Moore argued that an exhibit summarizing cell phone data should have been excluded from his trial because certain annotations, "pin points," and arrows were misleading. *Id*. The Fourth Circuit Court of Appeals rejected that claim, concluding that the exhibit was admissible because an officer testified at trial to explain the notations on the video, and Moore's attorney had the opportunity to cross-examine the officer and inquire into how the summary was produced. *Id.*

We view *Moore* as persuasive authority and conclude that its holding is well-taken. Here, Birdsell testified at trial about the notations he added to the video:

> [State]: And when you made -- when you made these determinations to determine that the time was what it needed to be, or made sure the correct time, I guess I should say, and then cut down the video pieces that you -- that were important to the case, did you do anything else with those videos?
>
> [Birdsell]: In a compilation, I put some text, just to say, for that particular video, what the -- either if the time was correct or if it was off, what -- which way to go.
>
> [State]: So you took each video and you noted the time, and you put the videos together in a compilation?
>
> [Birdsell]: That's correct.
>
> [State]: What other things did you include in the compilation?
>
> [Birdsell]: Just some overall maps to show, give some general -- kind of spatially where we are when we're looking at the videos, where the videos were taken from.
>
> . . .
>
> [State]: Did you include any other animation or anything like that to help discern what's happening in the video?
>
> [Birdsell]: A couple times, I used some callout boxes, just to point out an area to look. Because the video is not very clear, you might be able to just see movement. Just something to say, look in this area.
>
> [State]: Is there anything else that you included that would be important to know before we were to look at -- watch the video?
>
> [Birdsell]: I don't know.

---

[2] *See* Fed. R. App. P. 32.1 ("A court may not prohibit or restrict the citation of federal judicial opinions . . . or other written dispositions that have been: (i) designated as 'unpublished'. . . ")

[State]: Okay. The locations where the videos are depicted, do you show that in the video compilation?

[Birdsell]: Yes.

Later in Birdsell's trial testimony, as the State played the video compilation, Birdsell explained the notations on the video. For example, while watching a segment of video, Birdsell explained that notations on the screen were "red arrows indicat[ing] locations where we retrieved surveillance video, and the green arrows show a path of two subjects on bicycles." On cross-examination, Clyde did not inquire into any of the notations on the video or dispute that any of the maps, arrows, or call-outs accurately portrayed what the video depicted.

Clyde's claim on appeal that these notations told the jury how to interpret the videos is inconsistent with what the notations depicted and what Birdsell's testimony established. "Such statements are reports on what was contained in the video, not assumptions or conclusions." *United States v. Fechner*, 952 F.3d 954, 960 (8th Cir. 2020). As such, the editorial comments from Birdsell did not render the compilation video inadmissible under Rule 1006.

On Clyde's second point, the State argues that curating selections of videos taken from voluminous recordings is a permissible and inevitable part of the summary process, rather than a defect undermining the exhibit's admissibility. In support, the State directs this Court to a recent federal district court decision examining the same issue. In *United States v. Crawford*, 2024 WL 1908799 (D. D.C. May 1, 2024), a defendant who participated in the January 6 riots argued that video summaries of the events at the Capitol were not proper summaries under Federal Rule of Evidence 1006 because the government made "editorial choices" in creating the videos. *Id.* at *3. The defendant argued that "[b]y combining, rearranging, splicing, superimposing, and generally putting these pieces of [video footage] into a montage, the government is actually changing the evidence that it purports to summarize," in that the "montage has a powerful, Ken Burns-like effect. . . ." *Id.* (brackets in original, emphasis omitted). The court rejected the defendant's argument, explaining, "[t]he fact that the Government made decisions about which footage to include and exclude in the montages and how best to compile that footage, among other things, is therefore neither surprising nor troubling under [F.R.E. 1006]; if anything, it is inevitable." *Id.*

Other state and federal courts have also recognized that "compilation videos" comprise a "summary" under similar versions of Rule 1006. *See, e.g.*, *Commonwealth v. Suarez*, 129 N.E.3d 297 (2019) (upholding admission of surveillance footage summary as summary evidence); *United*

*States v. Segines*, 17 F.3d 847, 854 (6th Cir. 1994) (upholding admission of composite tapes as summary evidence); *United States v. Bakker*, 925 F.2d 728, 736–37 (4th Cir. 1991) (eleven composite tapes edited from over 200 hours of broadcasts admissible as summary evidence); *United States v. Rengifo*, 789 F.2d 975, 979 n.3 (1st Cir. 1986) (recognizing that the court has long upheld the use of composite tapes as evidence); *United States v. Denton*, 556 F.2d 811, 816 (6th Cir. 1977) (composite tape prepared by agents admissible as summary evidence).

That the State decided, through its witness, which video excerpts to include and which to exclude in the compilation does not run afoul of the Rule's language. This video was a "summary" under Rule 1006, substituting for the 11 videos from which the compilation video was extracted. As we mentioned above, Clyde has never contended that the video misrepresented what was depicted, nor claimed that the compilation was anything but an abridged version of several hours of surveillance video.

2. *Whether the 11 separate videos abridged into the compilation could be conveniently examined in court.*

Clyde next argues that Rule 1006 is only triggered on a finding that the underlying writings, recordings, or photographs "cannot be conveniently examined in court." There was no reason, from Clyde's perspective, that the individual surveillance video excerpts could not have been shown on their own, without the State's additional editorial information. According to Clyde, the duration of the 11 excerpts amounted to less than 29 minutes. The State maintains that while the excerpts selected for the compilation video may have amounted to 29 minutes, the entire lot of surveillance videos that Birdsell obtained included much more than that.

Birdsell testified at Clyde's preliminary hearing that he retrieved videos from "11 or 12 locations. There are multiple videos per location, but actual locations, 11 or 12." In testimony at Clyde's trial, Birdsell explained that, in reviewing all the surveillance tapes, some of the videos were more important to the investigation than others, noting that some of the videos "showed different subjects in the video. And then as well as people – or two subjects fleeing the scene afterwards on bicycles. So then we started looking for certain videos related to people on bicycles." After reviewing all the videos, Birdsell also testified that, to make it easier to discern what had happened, "[s]ome of the [videos] were shortened, made [into] little clips, so that we could, you know, basically make a little compilation."

Because the 11 videos that the compilation was created from were not admitted into evidence, we do not know the total duration of all 11 videos. That said, we can glean from the testimony of Birdsell that at least some of the surveillance videos contained lengthy segments with little to no relevance to the trial. Considered against a five-day trial with dozens of witnesses and hundreds of exhibits, this is precisely the type of evidence that the Rule is intended to govern— evidence too voluminous to "be conveniently examined in court," such that the videos must be edited to make a summary. That is what the State did here. Thus, the district court did not abuse its discretion in admitting the compilation video.

Finally, we discuss briefly the notion that the videos were improperly admitted as substantive evidence at trial. During argument before this Court, Clyde proposed that the compilation video was improperly before the jury as substantive evidence when it was a demonstrative exhibit. We have previously addressed the distinction between substantive and demonstrative evidence and explained that "Idaho trial judges have the discretion to allow demonstrative exhibits to be given to the jury during its deliberations[.]" *State v. Weigle*, 165 Idaho 482, 488–89, 447 P.3d 930, 936–37 (2019). The district court's decision to allow the compilation video to be given to the jury during deliberations was a discretionary decision, and the court acted within the outer bounds of its discretion in doing so. Accordingly, we affirm the district court's decision.

**D.     The cumulative error doctrine does not apply.**

"Under the doctrine of cumulative error, a series of errors, harmless in and of themselves, may in the aggregate show the absence of a fair trial." *State v. Reyes*, 169 Idaho 781, 791, 503 P.3d 997, 1007 (2022) (quotation marks omitted). Clyde argues that, even if individually harmless, the district court committed two evidentiary errors that, together, deprived him of a fair trial. These errors, according to Clyde, require a new trial. As we have discussed, the admission of the compilation video was not error. Without demonstrating that a second error occurred, apart from the Confrontation Clause error discussed above, the cumulative error doctrine does not apply.

## V.     CONCLUSION

The district court's judgment of conviction is affirmed.

JUSTICES BRODY, MOELLER, ZAHN, and MEYER CONCUR.

17